[No. 38920-7-II.   Division Two.   December 6, 2011.]

THE STATE OF WASHINGTON, *Respondent*, v. CHRISTOPHER LEON SMITH, *Appellant*.

298

300

David B. Koch (of Nielsen, Broman & Koch PLLC), for appellant.

Mark E. Lindquist, Prosecuting Attorney, and Stephen D. Trinen, Deputy, for respondent.

¶1 JOHANSON, J. — A jury found Christopher Leon Smith guilty of first degree rape, second degree child rape, two counts of first degree kidnapping, two counts of felony harassment, and first degree assault. Smith argues that (1) the officers' participation in the Crime Free Motel Program (CFMP) violated his Washington Constitution article I, § 7 rights and all evidence found after his arrest should have been suppressed and (2) his convictions for first degree rape and second degree child rape constitute double jeopardy. In his statement of additional grounds,[1] Smith argues that the trial court violated his constitutional speedy trial rights.

---

[1] RAP 10.10.

¶2 We hold that the victims' trial testimonies were admissible because they were the product of an independent source, and they were sufficiently attenuated from the illegal motel registry search. We therefore refrain from evaluating Smith's other evidentiary challenges to evidence that is cumulative of the victims' trial testimonies. We also hold that Smith's convictions for first degree rape and second degree child rape do not constitute double jeopardy because they are not legally comparable offenses. Finally, we hold that the trial court did not violate Smith's constitutional speedy trial rights. We affirm Smith's convictions.

## FACTS

¶3 On October 22, 2006, Lakewood Police Officer Austin Lee stopped at the Golden Lion Motel as part of the CFMP. The CFMP was a voluntary program that permitted a motel owner to allow police to check the 10 most recent entries on a guest registry to determine if those individuals had outstanding warrants. Officer Lee performed a warrant check at the Golden Lion Motel and discovered that Christopher Smith, a guest, had an outstanding warrant.

¶4 Officer Lee, assisted by other officers, knocked on Smith's motel room door. Smith opened the door, stepped outside, and was placed under arrest. After the arrest, the motel door remained open naturally and was not propped open by anyone. As Officer Lee was leading Smith away, other officers saw Quianna Quabner, who at a subsequent hearing testified that she had been unable to get to a phone to call police for help, inside the motel room "limping toward the door, sobbing a little bit" and holding a bloodied towel to her head. 1 Verbatim Report of Proceedings (VRP) at 40. Officers entered the room to perform "community caretaking" duties and assist her because of the "immediately obvious" head trauma that had occurred. 1 VRP at 29, 60.

¶5 Quabner informed the officers that she and Smith had gotten into an argument and that he had tied her to the

refrigerator and assaulted her with a metal candlestick and a picture frame. Quabner also reported that Smith had sexually assaulted her 12-year-old daughter, L.S., and had tied them both up. Although Quabner's 2-year-old son was also in the room during the incident, there were no allegations of abuse or injury inflicted on him. L.S. informed officers that the items Smith had used to tie them up were in a motel dumpster. The dumpster is open to the public and not secured. Officers found two bags of blood-stained items in the dumpster that appeared to have come from Smith's room.

¶6 After Quabner and L.S. were taken away for medical treatment, the officers searched the motel room and seized physical evidence. The officers failed to request a warrant before this search and seizure.

¶7 The State charged Smith with first degree rape, under RCW 9A.44.040(1)(a); second degree child rape, under RCW 9A.44.076; first degree kidnapping, under former RCW 9A.40.020 (1975); and felony harassment, under former RCW 9A.46.020 (2003), as to L.S. The State also charged Smith with first degree kidnapping, under former RCW 9A.40.020; first degree assault, under RCW 9A.36-.011(1)(a); and felony harassment, under former RCW 9A.46.020, as to Quabner. All of the charges included deadly weapon enhancement allegations.

¶8 After Smith was charged, but before his CrR 3.6 hearing, our Supreme Court issued *State v. Jorden*,[2] in which it held that absent a valid exception to the prohibition against warrantless searches, random viewings of a motel registry violate article I, § 7. Smith moved to suppress all evidence discovered after his arrest, arguing that it was tainted by the illegal motel registry search and that the State could not establish an independent source for the information.

---

[2] 160 Wn.2d 121, 131, 156 P.3d 893 (2007).

¶9 At the CrR 3.6 hearing, witnesses testified to the above facts. Quabner also testified that she had not been able to get to a phone before the police arrived, but that she would have called the police at the earliest available opportunity. Police officers testified that they entered the motel room to assist Quabner and not with an intent to look for drugs or collect evidence. The State conceded that the warrantless search of the motel room "after the patrol officers finished the arrest process and obtained medical aid for the victims" was not lawful and that the evidence seized at that time should be suppressed. 1 VRP at 120-21. But the State argued that under the inevitable discovery rule, the remaining evidence, including the victims' statements at the scene, police observations of the room during their initial entry when performing community caretaking functions, photographs of the victims' injuries, testimony from medical personnel, and evidence found in the dumpster, was still admissible, and that Quabner and L.S. could testify at trial. Smith responded that the inevitable discovery exception to the exclusionary rule was incompatible with article I, § 7.

¶10 The trial court found that Quabner would have called the police as soon as possible and that the inevitable discovery exception applied. The trial court found that the victims' statements, medical treatment, and sexual-assault-center interview were admissible, as was the evidence found in the dumpster, because all evidence would likely have been in the same condition at the time Quabner called the police. But the trial court also found that the State failed to prove that police would have observed the room in the same condition if they had entered it at a later date and excluded the officers' testimonies about their observations of the motel room's condition.[3]

¶11 At trial, L.S. and Quabner testified about the incident. L.S. testified that after Smith and her mother argued,

---

[3] The trial court also excluded statements Smith made after his arrest, but those statements are not relevant to this appeal.

Smith tied her and Quabner up. Smith tied Quabner's wrists together behind her back and tied her to a refrigerator's handles; Smith tied L.S.'s wrists, neck, and feet and placed her in a bedroom closet. About 20 or 30 minutes later, Smith took L.S. out of the closet and led her into the bathroom where he untied her. Smith put a knife to her throat and told her to do whatever he said. The knife had at least a three-inch blade. Smith told L.S., who was wearing a nightgown, to bend over the bathtub and she refused. Smith hit her in the nose with his hand, and she started bleeding. Smith again told her to cooperate before he did "something" to her mother or family. 6 VRP at 272. Next, Smith pulled down the top part of L.S.'s nightgown and told her to pull down her bra, which she did. L.S. sat on the toilet and Smith put his penis in her mouth while still holding the knife to her throat. With his penis still in her mouth, Smith also hit her on the shoulder with a hammer.

¶12 L.S. testified that after the bathroom assault, Smith left the motel room and she untied her mother. Smith returned soon thereafter with a gas can and said he was going to set them on fire. He also took a knife and made circular motions over Quabner's stomach and threatened to cut out the baby she carried. He did not carry out either threat. Instead, Smith grabbed a metal candlestick, which was about two or three inches thick, and hit Quabner in the head three or four times. Smith then broke a glass picture frame over Quabner's head.

¶13 When he stopped attacking Quabner, Smith told L.S. to clean up the blood. L.S. testified that she cleaned up blood in the kitchen and bathroom with a towel and cleaned up the broken glass. She placed the bloody cleaning towel, the broken glass, blood-stained clothes, and the ropes used to tie her and her mother up in a plastic bag and put the bag in the motel dumpster. L.S. testified that she later spoke with officers and medical personnel and, also during her testimony, L.S. identified pictures of objects she had placed in the dumpster.

¶14 Quabner testified about the fight with Smith, being tied up, and the assault; this testimony largely repeated L.S.'s testimony. Quabner also identified bloody clothing that she and L.S. wore during the attack and the rope used to tie them up.

¶15 Two Lakewood police officers testified about responding to the scene and observing Quabner's injuries. One officer also testified about photographs he took of Quabner's injuries outside the motel room and testified about bags of evidence he recovered from the motel dumpster. A Lakewood Police Department property and evidence supervisor identified evidence recovered from the dumpster and identified photographs taken of the dumpster evidence and Quabner's injuries. A detective testified about interviewing L.S. and Quabner later the day of the incident. The detective interviewed L.S. at the police station and described L.S. as calm, articulate, and cooperative. The detective also interviewed Quabner, but she did so at a hospital.

¶16 One of the paramedics who took Quabner to the hospital testified about Quabner's injuries and about Quabner's reporting that she had been struck with a picture frame and metal object on the left side of her head, left shoulder, left ribs, and left hip. Finally, Quabner's sister testified that she observed Quabner in the hospital and Quabner had about 15 staples in her head.

¶17 The jury found Smith guilty on all counts and found that he had possessed a deadly weapon at the time of each crime. The trial court entered a judgment on all counts and sentenced Smith to a total of 627 months to life confinement. Smith appeals.

## ANALYSIS

### I. CrR 3.6 Suppression Hearing

¶18 Smith argues that the trial court erred in denying his CrR 3.6 motion to suppress all of the evidence obtained

after his arrest, including the admission of Quabner's and L.S.'s testimonies at trial. He argues that under *Jorden*, the officers' warrantless search of the motel guest registry was an unlawful search and that under *State v. Winterstein*,[4] the inevitable discovery rule is an invalid basis for denying his suppression motion. Smith also argues that the good faith exception to the exclusionary rule does not apply in Washington or, even if it does apply, the exception's requirements are not met in this case. Finally, he argues that the trial court erred by not suppressing testimony about the officers' observations of the victims as they received medical aid and the officers' observations about evidence found in the dumpster.

¶19 As the parties acknowledge, the officers' participation in the CFMP to find and arrest Smith violated article I, § 7. *Jorden*, 160 Wn.2d at 131. Although the trial court found some of the evidence admissible under the inevitable discovery rule, our Supreme Court has since abandoned that rule because it is inconsistent with article I, § 7. *Winterstein*, 167 Wn.2d at 636. The State also acknowledges that our Supreme Court has recently held that there is no good faith exception to Washington's exclusionary rule. *State v. Afana*, 169 Wn.2d 169, 184, 233 P.3d 879 (2010). The State concedes that *Winterstein* and *Afana* could apply despite substantial factual and procedural distinctions in the present case. But the State argues that we should not reach either the inevitable discovery rule's or the "good faith" doctrine's applicability and, instead, that we should hold the victims' testimonies were admissible under the attenuation doctrine and independent source rule.

¶20 As an initial matter, Smith argues that the State specifically waived this argument below and, in addition,

---

[4] 167 Wn.2d 620, 220 P.3d 1226 (2009).

the State's failure to raise this argument below precludes our consideration of the issue.[5] We disagree.

¶21 For support, Smith relies on *State v. Ibarra-Cisneros*, 172 Wn.2d 880, 884-85, 263 P.3d 591 (2011). There our Supreme Court said, "Courts should not consider grounds to limit application of the exclusionary rule when the State at a CrR 3.6 hearing offers no supporting facts or argument." *Ibarra-Cisneros*, 172 Wn.2d at 885. Our Supreme Court rejected the "cursory application of the attenuation doctrine," noting, "Our resolution of this case is dictated by the limited record and briefing before us." *Ibarra-Cisneros*, 172 Wn.2d at 884. This is not the case here.

¶22 In *Ibarra-Cisneros*, the State separately prosecuted Gilberto Ibarra-Cisneros and his brother, Adrian Ibarra-Raya, on drug charges. *Ibarra-Cisneros*, 172 Wn.2d at 881. Without a warrant, officers searched Ibarra-Raya's home, found drugs in the house, arrested him, and seized his cell phone. While Ibarra-Raya was at the police station, Ibarra-Cisneros phoned his brother's cell phone. A drug enforcement officer answered without identifying himself, telling Ibarra-Cisneros in Spanish that his brother was in the bathroom and ultimately arranging to meet in a nearby parking lot. At the parking lot, officers followed Ibarra-Cisneros's vehicle; when Ibarra-Cisneros exited his vehicle, officers found a freshly dropped bindle of cocaine where he stood and charged him with possession. *Ibarra-Cisneros*, 172 Wn.2d at 882.

¶23 Ibarra-Cisneros and Ibarra-Raya jointly sought to suppress the evidence seized from the warrantless search of Ibarra-Raya's home. The State did not argue that the trial court need not exclude the evidence against Ibarra-

---

[5] In closing arguments during the CrR 3.6 hearing, defense counsel reported that the prosecutor had told him during a telephone conversation that he was not arguing an independent source theory. But the State did not confirm this on the record. Therefore, there is insufficient evidence in the record to conclude that the State waived this issue.

Cisneros because it was too attenuated[6] from the warrant-
less search of Ibarra-Raya; rather it treated both men's
claims as "rising or falling together." *Ibarra-Cisneros*, 172
Wn.2d at 883. The trial court refused to suppress the
evidence. Throughout the proceedings the State relied on all
of the evidence gathered and did not seek to distinguish the
evidence against Ibarra-Cisneros from the evidence against
Ibarra-Raya. *Ibarra-Cisneros*, 172 Wn.2d at 883.

¶24 On appeal, Division Three of this court reversed
Ibarra-Raya's conviction, holding that the search of his
home was unlawful, but affirmed Ibarra-Cisneros's convic-
tion, concluding that it need not exclude that evidence
because it was " 'too attenuated' " from the unlawful search
of his brother's home. *Ibarra-Cisneros*, 172 Wn.2d at 883-84
(quoting *State v. Ibarra-Raya*, 145 Wn. App. 516, 524, 187
P.3d 301 (2008)).

■ ¶25 Here, unlike *Ibarra-Cisneros*, at the CrR 3.6
hearing, the State stipulated that certain items were inad-
missible because police discovered those items based on only
an unlawful search. The State distinguished on the record
the evidence it considered to be independent from unlaw-
ful search and developed both facts and legal argument
supporting its position. Therefore, unlike the "limited
factual record" before our Supreme Court in *Ibarra-
Cisneros*, the record here offers supporting facts and argu-
ment for us to consider the doctrines of attenuation and
independent source. *Ibarra-Cisneros*, 172 Wn.2d at 883. We
may affirm on any ground the record supports. *State v.
Costich*, 152 Wn.2d 463, 477, 98 P.3d 795 (2004). After
addressing the admissibility of Quabner's and L.S.'s trial
testimonies, and determining that both the independent
source and the attenuation exceptions support their admis-
sibility, we refrain from evaluating Smith's other challenges

---

[6] Nor did the State argue against exclusion based on issues involving standing,
a valid *Terry* stop, or the open view exception (citing *Terry v. Ohio*, 392 U.S. 1, 88
S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). *Ibarra-Cisneros*, 172 Wn.2d at 882-83.

to evidence that is cumulative of Quabner's and L.S.'s trial testimonies.

## A. STANDARD OF REVIEW

█ ¶26 Evidence seized during illegal searches and evidence derived from illegal searches is subject to suppression under the exclusionary rule. *State v. Gaines*, 154 Wn.2d 711, 716-17, 116 P.3d 993 (2005). The exclusionary rule applies to evidence derived directly and indirectly from illegal police conduct. *State v. Tan Le*, 103 Wn. App. 354, 361, 12 P.3d 653 (2000). Derivative evidence will be excluded unless it was obtained without exploiting the original illegality or by means sufficiently distinguishable to be purged of the primary taint. *Le*, 103 Wn. App. at 361. To prove that evidence has been purged of taint, the State must show that either (1) intervening circumstances have attenuated the link between the illegality and the evidence *or* (2) the evidence was discovered through a source independent from the illegality. *State v. McReynolds*, 117 Wn. App. 309, 322, 71 P.3d 663 (2003) (quoting *Le*, 103 Wn. App. at 361).

## B. INDEPENDENT SOURCE

¶27 The State argues that the victims' testimonies were admissible under the independent source exception because the emergency aid and community caretaking exceptions acted as intervening factors. We agree. Although arguably entry into the motel room violated Smith's article I, § 7 rights, the entry was to aid Quabner and not to search for evidence.

█ ¶28 The independent source exception to the exclusionary rule was initially applied under a Fourth Amendment analysis. *See Gaines*, 154 Wn.2d at 717-18; *State v. Coates*, 107 Wn.2d 882, 887-88, 735 P.2d 64 (1987). But the independent source exception has long been accepted by both the United States Supreme Court and the Washington

Supreme Court. *Murray v. United States*, 487 U.S. 533, 537, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988); *Gaines*, 154 Wn.2d at 717. Our Supreme Court has repeatedly held that the independent source rule is compatible with article I, § 7. *Gaines*, 154 Wn.2d at 717-18, 722; *see Winterstein*, 167 Wn.2d at 634; *see also State v. Smith*, 113 Wn. App. 846, 856, 55 P.3d 686 (2002), *review denied*, 149 Wn.2d 1014 (2003).

¶29 Under the independent source doctrine, evidence tainted by unlawful government action is not subject to suppression under the exclusionary rule if officers ultimately obtain it using "a valid warrant *or other lawful means independent of the unlawful action.*" *Gaines*, 154 Wn.2d at 718 (emphasis added); *State v. Hilton*, 164 Wn. App. 81, 90, 261 P.3d 683 (2011), *petition for review filed*, No. 86768-2 (Wash. Dec. 1, 2011). An unlawful search does not invalidate a subsequent search if the subsequent search is based on untainted independently obtained information, and the State's decision to search is not motivated by the previous unlawful search and seizure. *See State v. Miles*, 159 Wn. App. 282, 292-94, 244 P.3d 1030 (citing *Murray*, 487 U.S. at 542-43), *review denied*, 171 Wn.2d 1022 (2011); *see also Gaines*, 154 Wn.2d at 718, 721. The independent source doctrine recognizes that probable cause may exist based on legally obtained evidence; the tainted evidence, however, is suppressed. *Winterstein*, 167 Wn.2d at 634.

■■ ¶30 The independent source doctrine differs from the inevitable discovery doctrine. Whereas the inevitable discovery doctrine requires a speculative analysis of whether the police would have ultimately obtained the same evidence by other lawful means, the independent source exception contains no similar speculative considerations. *Hilton*, 164 Wn. App. at 91-92. Rather than considering whether the police would have found the same evidence by lawful means, the independent source exception requires considering if evidence is tainted by earlier unlawful government actions. *Hilton*, 164 Wn. App. at 91-92. This

is not a speculative question and instead requires a review of "what the police were doing and what motivated them to take the action they did" when they found the evidence. *Hilton*, 164 Wn. App. at 92.

¶31 Furthermore, the independent source doctrine, unlike inevitable discovery, is not based on the need to deter unlawful police conduct; rather it is based on individual privacy rights. *See Winterstein*, 167 Wn.2d at 634. Also, the rationale for the independent source rule is "that the police should not be in a worse position than they otherwise would have been because of the error." *Hilton*, 164 Wn. App. at 90 (citing *Murray*, 487 U.S. at 537).

¶32 Here, the officers' decision to enter the motel room was based on independent, untainted information because Quabner sought their assistance as community caretakers after the officers had arrested Smith and were preparing to leave. Quabner's obvious need for assistance, and the officers' community caretaking responsibilities, was a supervening, intervening factor that allowed an emergency aid exception to the warrant requirement. In addition, the subsequent search was not motivated by a continuation of the registry search. Officer Lee had already arrested Smith on the warrant and was leading Smith away when Quabner limped to the door, sobbing and holding a bloody towel to her head.

¶33 The officers' entry into the motel room was a valid exercise of their community caretaking functions and, as such, was a valid emergency aid exception to the warrant requirement.[7] A proper community caretaking function is divorced from a criminal investigation. *State v. Kinzy*, 141 Wn.2d 373, 386-88, 5 P.3d 668 (2000), *cert. denied*, 531 U.S. 1104 (2001). The emergency aid exception to the warrant requirement applies when (1) the officer subjectively believed that someone likely needed assistance for health or

---

[7] Every officer stated at the CrR 3.6 hearing that they entered the motel room to perform community caretaking functions and assist Quabner.

safety reasons, (2) a reasonable person in the same situation would similarly believe that there was a need for assistance, and (3) there was a reasonable basis to associate the need for assistance with the place searched. *Kinzy*, 141 Wn.2d at 386-87; *see also Kinzy*, 141 Wn.2d at 386 n.39 (discussing the connection between community caretaking responsibilities and the emergency aid exception to the warrant requirement). The State must establish that the police had a reasonable belief that all the elements of the emergency aid exception were satisfied before entering a residence. *State v. Schultz*, 170 Wn.2d 746, 759-60, 248 P.3d 484 (2011).

¶34 In *Schultz*, our Supreme Court held that officers did not have enough facts to justify an entry based on the emergency aid exception. Officers responded to a call about a man and woman yelling, and while outside Schultz's apartment they overheard a man and woman talking loudly. *Schultz*, 170 Wn.2d at 760. Schultz answered the door and appeared flustered. *Schultz*, 170 Wn.2d at 760. She initially told officers no one else was there, but the male occupant soon came to the door. *Schultz*, 170 Wn.2d at 760. When he did, officers entered the apartment. *Schultz*, 170 Wn.2d at 760. Our Supreme Court held that at the time they entered, officers did not have enough evidence to justify an entry because they did not notice red marks on Schultz's neck until after they entered, the male occupant appeared at the door before officers entered, and there was no evidence that police had responded to the residence in the past or that the situation was volatile and escalating. *Schultz*, 170 Wn.2d at 760-61.

¶35 Here, the officers had reason to believe all three requirements to the emergency aid exception were met before they entered the motel room. Unlike the officers in *Schultz*, the officers here saw Quabner limp to the door, sobbing and holding a bloody towel to her head. The officers subjectively believed she needed medical assistance because of her "immediately obvious" head trauma, and a

reasonable person would have concurred. 1 VRP at 29. Furthermore, the officers' entry into the motel room was unrelated to Smith's arrest for the outstanding warrant and, thus, was divorced from that criminal investigation. Therefore, it was reasonable for officers to enter the motel room to assist Quabner. Accordingly, Quabner's and L.S.'s testimonies were the product of an independent source and not subject to suppression under the exclusionary rule.

## C. ATTENUATION

¶36 The State also argues that the victims' trial testimonies were sufficiently attenuated from the illegal police conduct and are, therefore, admissible. In light of our Supreme Court's recent split decision in *State v. Eserjose*, 171 Wn.2d 907, 259 P.3d 172 (2011), whether the attenuation exception to the search warrant requirement is permitted under our state constitution remains an open question. *See Eserjose*, 171 Wn.2d at 930, 934 (Madsen, C.J., concurring) (refusing to apply the lead opinion's attenuation analysis to resolve the suppression issues on appeal), 937 (C. Johnson, J., dissenting) ("We should therefore reject the attenuation exception (as the lead opinion *seems* to embrace) to our exclusionary rule." (emphasis added)). But assuming that the attenuation exception is permitted in our state, we agree with the State's argument that the attenuation exception also supports the admissibility of the victims' trial testimonies in this case.

¶37 Relevant factors we consider in determining whether the witness's testimony is sufficiently attenuated from the police misconduct are (1) the length of the "road" between the unlawful police conduct and the witness's testimony; (2) the degree of free will the witness exercised; and (3) whether exclusion would permanently disable the witness from testifying about relevant and material facts, even though the testimony might be unrelated to the original illegal search's purpose or the evidence discovered

during it. *State v. Childress*, 35 Wn. App. 314, 316, 666 P.2d 941, *review denied*, 100 Wn.2d 1031 (1983). Additional factors we consider to determine attenuation between police misconduct and witness testimony are (1) the witnesses' stated willingness to testify; (2) the role the illegally seized evidence played in gaining the witnesses' cooperation; (3) the proximity between the illegal behavior, the witnesses' decisions to cooperate, and the actual trial testimony; and (4) the police motivation in conducting the search. *State v. Stone*, 56 Wn. App. 153, 162, 782 P.2d 1093 (1989) (quoting *State v. West*, 49 Wn. App. 166, 170, 741 P.2d 563, *review denied*, 109 Wn.2d 1010 (1987)), *review denied*, 114 Wn.2d 1013 (1990).

¶38 The *Childress* factors weigh in favor of attenuation. First, nearly two years passed between the officers' illegal motel guest registry search and Quabner's and L.S.'s testimonies. As to the second element, Quabner herself reached out to officers for help, thus exerting considerable free will, and rendering their entry *into* the motel room lawful—as opposed to the police's approach merely to the motel room door to arrest Smith on an outstanding warrant. Also, at trial, the detective who interviewed L.S. described her as cooperative. Third, suppression would prevent Quabner and L.S. from testifying about events that had no relevance to the illegal police conduct or why the officers initially arrested Smith. *See Stone*, 56 Wn. App. at 162 (finding the third *Childress* factor showed attenuation where a witness gave testimony about a crime of which an investigating officer had not been aware).

¶39 The *Stone* factors provide additional support for finding attenuation. First, the nature of Quabner's and L.S.'s trial testimonies suggests they were voluntary. For instance, at trial both Quabner and L.S. readily answered questions and neither were declared hostile witnesses. As to the second *Stone* factor, Quabner stated that she would have called the police at her earliest opportunity had the police not shown up, suggesting that she wanted police help

and would have cooperated with the criminal investigation regardless of any police misconduct.[8] For the third additional factor the record does not indicate what role, if any, the illegal search played in either witness's testifying. But it is hard to imagine what impact the illegal motel registry search could have played in gaining Quabner's and L.S.'s cooperation to testify at a trial held two years later. Moreover, as the victims of Smith's criminal acts, it is reasonable to assume that they were willing to testify against him. Finally, for the last *Stone* factor the officers' motivation in searching for Smith's outstanding warrants was to apprehend a wanted person and not to investigate, without a warrant, the crimes ultimately uncovered in this case. Accordingly, the additional *Stone* factors also support an attenuation finding.

¶40 Taken as a whole, there is a long road between the illegal motel registry search and the victims' testimonies. The victims cooperated with officers at the scene and their testimonies were completely unrelated to the illegal motel registry search. In addition, the officers did not perform the motel registry search in order to find the evidence and crimes involved in this case.

¶41 Moreover, even if Quabner's and L.S.'s testimonies were the result of a constitutional violation, both federal courts and Washington courts have held that witness testimonies are not subject to suppression because of the constitutional violation. *Hilton*, 164 Wn. App. at 89-90 (citing numerous federal and state court decisions where testimonies discovered through constitutional violations are not subject to suppression). A witness's free will in testifying attenuates "any taint that led to the discovery of the witness." *Hilton*, 164 Wn. App. at 89.

¶42 Thus, we hold that the State has carried its burden to show that the victims' trial testimonies were sufficiently attenuated from the illegal search.

---

[8] Contrary to the State's claim, there was no evidence that L.S. would or would not have called police or contacted anyone for help.

## D. Harmless Error

¶43 The State argues that any error in admitting evidence other than the victims' testimonies was harmless because it was cumulative. Smith asserts that the additional evidence is not duplicative because it tended to corroborate L.S.'s and Quabner's claims and, thus, increased the likelihood the jury would find him guilty. We agree with the State's argument.

■ ¶44 We apply a harmless error analysis when the trial court admits evidence that is a product of a warrantless search. *See State v. Guloy*, 104 Wn.2d 412, 425-26, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). A constitutional error is harmless if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt. *Guloy*, 104 Wn.2d at 425-26.

¶45 Evidence is duplicative if it adds little to the determination of the defendant's guilt and is repeated by other, admissible evidence. *State v. Hopkins*, 134 Wn. App. 780, 792, 142 P.3d 1104 (2006), *review denied*, 160 Wn.2d 1020 (2007). In *Hopkins*, we held that the admission of a doctor's medical report without calling her to testify violated the defendant's confrontation clause rights. *Hopkins*, 134 Wn. App. at 791. But the error was harmless because there was overwhelming evidence to support the defendant's convictions. *Hopkins*, 134 Wn. App. at 792. Specifically, the victim testified at length about her sexual contacts with Hopkins, Hopkins wrote a detailed confession, another witness had overheard Hopkins and the victim kissing, and the victim had written in her journal that she and Hopkins were in love and had kissed. *Hopkins*, 134 Wn. App. at 792. The doctor's testimony added little because her examination found no evidence of sexual activity, and because the victim testified about her relationship with Hopkins. *Hopkins*, 134 Wn. App. at 792. We held that this fact made the doctor's testimony duplicative and admission of the evidence was

harmless beyond a reasonable doubt. *Hopkins*, 134 Wn. App. at 792.

¶46 L.S.'s and Quabner's testimonies provide overwhelming evidence of Smith's guilt. L.S. and Quabner testified that Smith tied them up against their will, that Smith assaulted Quabner with a candlestick and a picture frame, and that he threatened to cut the baby out of Quabner's stomach. L.S. also testified that Smith placed his penis in her mouth, that she was 12 years old at the time and not married to Smith, and that he was more than 3 years older than she. Both witnesses testified about evidence being placed in a dumpster.

¶47 Similar to *Hopkins*, here the other witnesses gave duplicative testimonies. L.S. testified that she placed specific blood-stained items in the dumpster. This evidence made the property and evidence supervisor's testimony duplicative. L.S. testified about Smith's placing his penis in her mouth, which did not leave any physical marks. The nurse practitioner's testimony that L.S. reported the abuse and that she had no visible injuries was duplicative, as was the doctor's testimony in *Hopkins*. Quabner and L.S. testified extensively about Quabner's injuries, making the observations of the officers, paramedic, and Quabner's sister duplicative. Assuming without deciding that the trial court erroneously admitted the remaining evidence, any error was harmless beyond a reasonable doubt.

## II. DOUBLE JEOPARDY

¶48 Next, Smith argues that his convictions for first degree rape and second degree child rape constitute double jeopardy. The State argues that the convictions do not constitute double jeopardy because they have different elements. We discern no double jeopardy.

### A. STANDARD OF REVIEW

¶49 Double jeopardy claims are questions of law, which we review de novo. *State v. Hughes*, 166 Wn.2d 675,

681, 212 P.3d 558 (2009). First, we examine the statutory language to see if the applicable statutes expressly permit punishment for the same act or transaction. *Hughes*, 166 Wn.2d at 681. If the statutes do not expressly allow for multiple convictions arising from the same act, we next turn to rules of statutory construction to determine the legislative intent as to whether the two offenses may be punished cumulatively. *Hughes*, 166 Wn.2d at 681-82; *State v. Calle*, 125 Wn.2d 769, 777, 888 P.2d 155 (1995).

¶50 There are two primary rules of statutory construction that Washington courts have employed to discern legislative intent in similar cases. *Calle*, 125 Wn.2d at 777-80. One statutory construction rule applied is the "same evidence" test.[9] *Hughes*, 166 Wn.2d at 681-82; *Calle*, 125 Wn.2d at 777-78. Under the same evidence test, two statutory offenses are the same for double jeopardy purposes if the offenses are identical in law and in fact. *Hughes*, 166 Wn.2d at 682; *Calle*, 125 Wn.2d at 777. Two sex offenses are the same in fact if they arose out of one act of sexual intercourse with the same victim. *Hughes*, 166 Wn.2d at 684. Under the legal prong of the analysis, if each offense includes an element not included in the other and requires proof of a fact the other does not, then the statutory offenses are not constitutionally the same under this test and double jeopardy prohibitions are not violated. *Hughes*, 166 Wn.2d at 682; *Calle*, 125 Wn.2d at 777. The legal element analysis requires more than just a facial comparison of the statutory offenses' requirements. *Hughes*, 166 Wn.2d at 684.

¶51 The other rule of statutory construction used to discern legislative intent is whether the legislature has "clearly indicated its intent that the same conduct or transaction will not be punished under both statutes." *Hughes*, 166 Wn.2d at 682; *see Calle*, 125 Wn.2d at 780. This

---

[9] Washington's same evidence test is very similar to the rule set forth in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932). *Calle*, 125 Wn.2d at 777.

part of the analysis involves reviewing legislative history, the structure of the statutes, and the purpose of the statutes. *Hughes*, 166 Wn.2d at 684. Where the results of the same evidence test would allow multiple convictions to stand, only "clear evidence of [a] contrary [legislative] intent" can override the same evidence test results. *Calle*, 125 Wn.2d at 780.[10]

## B. ANALYSIS

¶52 We begin by noting that although Washington courts have analyzed a variety of double jeopardy claims comparing various combinations of the rape, child rape, incest, and child molestation statutes, a double jeopardy analysis of the specific combination of first degree rape and any degree of child rape appears to be a matter of first impression. Here, the statutes at issue are RCW 9A.44.040(1)(a) (first degree rape) and RCW 9A.44.076 (second degree child rape). These statutes do not expressly permit punishment for the same

---

[10] We note that in *State v. Kelley*, 168 Wn.2d 72, 226 P.3d 773 (2010) and *State v. Kier*, 164 Wn.2d 798, 194 P.3d 212 (2008), our Supreme Court suggested that clear legislative intent, as gleaned from legislative history, is reviewed in conjunction with the express statutory language, part of the comparability analysis, and like express statutory language that legislative history is outcome determinative and overrides the results of the same evidence test. *Kelley*, 168 Wn.2d at 77 ("If, however, such clear legislative intent is absent, then the *Blockburger* test applies . . . . [T]he *Blockburger* test is a rule of statutory construction applied to discern legislative purpose *in the absence of clear indications of contrary legislative intent*."); *Kier*, 164 Wn.2d at 804 ("We first consider express or implicit legislative intent based on the criminal statutes involved. *If the legislative intent is unclear, we may then turn to the* 'same evidence' *Blockburger* test, which asks if the crimes are the same in law and in fact." (emphasis added) (citation omitted)). The *Kelley* and *Kier* courts cite *Calle* as supporting authority.

But the *Calle* court, and the *Hughes* court, reviewed legislative history *after* evaluating statutes under the same evidence test and discuss whether legislative history supports or refutes the results of the same evidence analysis. *Hughes*, 166 Wn.2d at 682-85; *Calle*, 125 Wn.2d at 778-82. Moreover, discerning legislative intent *beyond the express language of a statute* is a canon of statutory construction itself. Accordingly, we adhere to the *Calle* and *Hughes* courts' use of the legislative history analysis as a tool of statutory construction that is subordinate to the same evidence analysis, unless there is "clear evidence of [a] contrary [legislative] intent" in the legislative history. *Calle*, 125 Wn.2d at 780.

act.[11] Therefore, we turn to tools of statutory construction to determine legislative intent and begin by analyzing the statutes under the same evidence test. *Hughes*, 166 Wn.2d at 681-82; *Calle*, 125 Wn.2d at 778-80.

¶53 Here, the second degree child rape and first degree rape convictions are the same in fact because they arose out of one act of sexual intercourse with the same victim. *Hughes*, 166 Wn.2d at 684. But the offenses charged here are not the same in law. First degree rape, as charged here, required the State to prove Smith (1) engaged in sexual intercourse with L.S., (2) used forcible compulsion, (3) used a deadly weapon or what appeared to be a deadly weapon, and (4) committed the acts in Washington. RCW 9A.44.040(1)(a). In contrast, second degree child rape required the State to prove that (1) Smith had sexual intercourse with L.S., (2) L.S. was at least 12 years old but less than 14 years old and not married to Smith at the time of the intercourse, (3) L.S. was at least 36 months younger than Smith, and (4) the acts occurred in Washington. RCW 9A.44.076.

¶54 *Hughes* requires that we do not rely on mere facial differences between the two charged rape statutes in our same evidence test analysis. *Hughes*, 166 Wn.2d at 684. First degree rape, regardless of the specific statutory subsection the State charged, *always* requires proof of forcible compulsion.[12] RCW 9A.44.040(1) ("A person is guilty of rape in the first degree when such person engages in sexual intercourse with another person *by forcible compulsion* where the perpetrator or accessory: [listing four different alternatives of additionally required elements]." (emphasis added)). In contrast, none of the child rape statutes require

---

[11] An example of express statutory language permitting multiple punishments for the same acts is the antimerger burglary statute. RCW 9A.52.050.

[12] "Forcible compulsion" means "physical force which overcomes resistance, or a threat, express or implied, that places a person in fear of death or physical injury to herself or himself or another person, or in fear that she or he or another person will be kidnapped." RCW 9A.44.010(6).

proof of forcible compulsion. RCW 9A.44.073, .076, .079. Instead, as explained in *Hughes*, second degree child rape requires proof of the victim's inability to consent by reason of his or her status (i.e., age, mental incapacity, or physical helplessness). *Hughes*, 166 Wn.2d at 684.

¶55 First degree rape and second degree child rape differ because (1) no status-based elements exist in first degree rape and (2) forcible compulsion is not an element of second degree child rape. Accordingly, first degree rape and second degree child rape are not legally comparable offenses because of unique elements in each offense.

¶56 Smith argues that *Calle* and *Hughes* compel the opposite conclusion for the same evidence analysis of first degree rape and second degree child rape—that these offenses are legally the same. Smith's reliance on these cases is misplaced.

¶57 The *Hughes* court considered the legal comparability of second degree child rape and second degree rape. *Hughes*, 166 Wn.2d at 679. Specifically, the court evaluated a second degree rape conviction of a "victim . . . incapable of consent by reason of being physically helpless or mentally incapacitated." RCW 9A.44.050(1)(b); *Hughes*, 166 Wn.2d at 679. Our Supreme Court held that "[r]egardless of whether nonconsent is proved by the age of the victim and the age differential between the victim and the perpetrator or by the mental incapacity or physical helplessness of the victim, both statutes protect individuals who are unable to consent by reason of their status." *Hughes*, 166 Wn.2d at 684. Accordingly, the *Hughes* court determined that second degree child rape and second degree rape based on RCW 9A.44.050(1)(b) were the same in law. But first degree rape differs from second degree rape under RCW 9A.44.050(1)(b) for the same reasons that first degree rape differs from second degree child rape. Second degree rape under RCW 9A.44.050(1)(b) requires proof of inability to consent based on the victim's status whereas first degree rape, as charged

here, requires proof of forcible compulsion and the use of a deadly weapon. Accordingly, *Hughes* does not control.[13]

¶58 *Calle* actually supports our same evidence analysis in this case. *Calle* concerned the comparability of first degree incest and second degree rape based on RCW 9A.44-.050(1)(a). *Calle*, 125 Wn.2d at 778. Our Supreme Court determined that "[i]ncest requires proof of relationship[, whereas second degree rape based on RCW 9A.44.050(1)(a)] requires proof of force. Therefore, the two offenses are not the same under . . . the 'same evidence' test." *Calle*, 125 Wn.2d at 778. The *Calle* court's distinguishing between two sex crimes because one required proof of force and the other a particular victim status (i.e., familial relationship with the defendant) supports our same evidence analysis in this case.

¶59 Clear legislative intent does not contradict our same evidence test conclusion that first degree rape and second degree child rape are legally different offenses that do not constitute double jeopardy. "[T]he presumption accorded to statutes by [the same evidence test] should be overcome only by clear evidence of contrary [legislative] intent." *Calle*, 125 Wn.2d at 780. In *Hughes*, our Supreme Court reasoned for the two offenses evaluated that (1) both statutes establish strict liability based on the victim's inability to consent due to the victim's status; (2) the offenses were located in the same subsection of the RCW, chapter 9A.44 RCW; and (3) "our courts have specifically recognized that the legislature did not intend one act of sexual intercourse to violate both the rape and statutory rape provision of our code." *Hughes*, 166 Wn.2d at 685.

¶60 Again, *Hughes* concerned second degree child rape and nonforcible compulsion second degree rape. But where forcible compulsion is a requirement of the rape offense compared to a rape offense without a forcible compulsion

---

[13] If Hughes's conviction had been based on RCW 9A.44.050(1)(a), the "forcible compulsion" alternative for second degree rape, then *Hughes* would be on all fours with this case.

element, there is no clear legislative intent that multiple convictions from the same act of intercourse cannot stand. In contrast to the first *Hughes* consideration, there is no strict liability for rape involving forcible compulsion comparable to second degree child rape's recognition as a "strict liability [offense] based on the inability to consent due to [a] victim's status." *Hughes*, 166 Wn.2d at 685.

¶61 We are also not convinced that the third part of the *Hughes* legislative intent analysis applies to the facts in this case. The *Hughes* court stated that our legislature's development of all aspects of our state's rape and statutory rape statutes is the "defin[ing of] a single crime of rape with the degree of punishment depending on the underlying circumstances." *Hughes*, 166 Wn.2d at 686. Including this point in the overall legislative analysis is sound when comparing the various degrees of rape that *do not* require proof of forcible compulsion with child rape, which relies on relatively minor distinctions in the ways that a victim's status contributes to his or her inability to consent, also without requiring proof of force. But the applicability of this reasoning becomes questionable when the use of force against a victim enters the equation. To hold that the legislature intended to treat forcible rape and rape based on a victim's inability to consent as equivalent, without some clear expression of that legislative intent, would fail to acknowledge profound distinctions between statutory elements of force and victim status. And in *Calle* when our Supreme Court was presented with a double jeopardy question requiring a comparison of victim status and force elements, our Supreme Court discerned no violation of the constitutional prohibition of double jeopardy. *Calle*, 125 Wn.2d at 778, 782. Accordingly, it does not appear that our Supreme Court's analysis in *Hughes* on this point applies or controls here.

¶62 Thus, in the legislative intent analysis the only similarity in this case and *Hughes* is that the criminal statutes reviewed are all codified in chapter 9A.44 RCW.

The codification of two crimes in the same chapter in and of itself does not demonstrate a clear legislative intent to treat the two crimes as the same offense for double jeopardy purposes. Nor does such codification refute the results of the same evidence test when the two offenses are not the same in law. We will not ignore the differences between forcible rape by use of a deadly weapon and rape based on a victim's inability to consent merely because all the relevant statutes are codified under chapter 9A.44 RCW. *See Hughes*, 166 Wn.2d at 685-86.

¶63 Based on these reasons, we hold that the first degree rape and second degree child rape charges in this case, under RCW 9A.44.040(1)(a) and RCW 9A.44.076, are not legally equivalent crimes and that the legislature did not intend to prohibit multiple convictions arising from a single sexual act. We hold that Smith's convictions for first degree rape and second degree child rape do not constitute double jeopardy.

### III. Statement of Additional Grounds (SAG)

¶64 In his SAG, Smith argues that the trial court violated his constitutional speedy trial rights by granting multiple continuances. We disagree.

¶65 We review a claimed denial of constitutional rights de novo. *State v. Iniguez*, 167 Wn.2d 273, 280, 217 P.3d 768 (2009). The threshold for a constitutional speedy trial violation, however, is higher than that for a violation of CrR 3.3. *State v. Fladebo*, 113 Wn.2d 388, 393, 779 P.2d 707 (1989); *see also* U.S. Const. amend. VI; Wash. Const. art. I, § 22. The constitutional right to a speedy trial is not violated by passage of a fixed time but, rather, at the expiration of a reasonable time. *State v. Monson*, 84 Wn. App. 703, 711, 929 P.2d 1186, *review denied*, 133 Wn.2d 1015 (1997). We consider four factors in determining whether a delay in bringing a defendant to trial impairs the constitutional right to the prompt adjudication of criminal

charges: the length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 920, 952 P.2d 116 (1998).

¶66 The trial court did not err in granting five of the continuances because Smith agreed to them and/or signed the related orders. Smith refused to sign the August 27, 2008 order continuing the trial date for roughly two weeks. But both defense counsel and the State requested that continuance to finalize CrR 3.6 issues. *See Pers. Restraint of Benn*, 134 Wn.2d at 920 (no prejudice where defendant agreed to continuances or his counsel requested continuance to more fully prepare).

¶67 Finally, on January 10, 2008, Smith did not sign an order continuing the case for one month, but the trial court granted that continuance due to the birth of the prosecutor's child and the prosecutor's ongoing murder trial. A continuance on these grounds was reasonable, and there is no evidence that the delay prejudiced Smith.

¶68 We affirm Smith's convictions.

QUINN-BRINTNALL, J., concurs.

¶69 ARMSTRONG, J. (dissenting) — Because I do not agree with the majority's reliance on the attenuation doctrine or application of the independent source doctrine, I respectfully dissent.

## I. ATTENUATION DOCTRINE

¶70 In its attenuation analysis, the majority relies on Court of Appeals cases that address federal constitutional violations and apply the attenuation doctrine as an exception to the federal exclusionary rule. *See State v. Stone*, 56 Wn. App. 153, 160-62, 782 P.2d 1093 (1989); *State v. West*, 49 Wn. App. 166, 168-70, 741 P.2d 563 (1987); *State v. Childress*,

35 Wn. App. 314, 316, 666 P.2d 941 (1983).[14] The Supreme Court of Washington recently discussed the exclusionary rule under our state constitution in *State v. Afana*, 169 Wn.2d 169, 179-81, 233 P.3d 879 (2010), and *State v. Winterstein*, 167 Wn.2d 620, 631-36, 220 P.3d 1226 (2009). Based on these cases, I do not believe the attenuation doctrine is a valid exception to the exclusionary rule under our state constitution.

¶71 In *Afana* and *Winterstein*, our Supreme Court observed that unlike its federal counterpart, Washington's exclusionary rule is " 'nearly categorical.' " *Afana*, 169 Wn.2d at 180 (quoting *Winterstein*, 167 Wn.2d at 636). This is because article I, section 7 of the Washington Constitution "clearly recognizes an individual's right to privacy with no express limitations." *State v. White*, 97 Wn.2d 92, 110, 640 P.2d 1061 (1982), *abrogated on other grounds by State v. Potter*, 156 Wn.2d 835, 132 P.3d 1089 (2006) and *State v. Brockob*, 159 Wn.2d 311, 150 P.3d 59 (2006); *see also Afana*, 169 Wn.2d at 180; *Winterstein*, 167 Wn.2d at 631-32. Our Supreme Court has repeatedly stated that the right to privacy under this provision "shall not be diminished by the judicial gloss of a selectively applied exclusionary remedy." *White*, 97 Wn.2d at 110; *see also Afana*, 169 Wn.2d at 180; *Winterstein*, 167 Wn.2d at 632. Therefore, "any evidence seized unlawfully will be suppressed." *Afana*, 169 Wn.2d at 180; *see also Winterstein*, 167 Wn.2d at 632-33; *State v. Ladson*, 138 Wn.2d 343, 359, 979 P.2d 833 (1999) ("When an unconstitutional search or seizure occurs, all subsequently uncovered evidence becomes fruit of the poisonous tree and must be suppressed."). "With very few exceptions, whenever the right of privacy is violated, the remedy follows automatically." *Afana*, 169 Wn.2d at 180. Our strict exclusionary rule " 'saves article 1, section 7 from becoming a meaningless promise.' " *Ladson*, 138 Wn.2d at 359 (quoting Sanford E. Pitler, *The Origin and Development of Washington's*

---

[14] These cases rely on *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963), and *United States v. Ceccolini*, 435 U.S. 268, 98 S. Ct. 1054, 55 L. Ed. 2d 268 (1978).

*Independent Exclusionary Rule: Constitutional Right and Constitutionally Compelled Remedy*, 61 WASH. L. REV. 459, 508 (1986)).

¶72 For example, our Supreme Court has recognized the independent source doctrine as a valid exception to the exclusionary rule but rejected the inevitable discovery doctrine. *Winterstein*, 167 Wn.2d at 634, 636; *State v. Gaines*, 154 Wn.2d 711, 722, 116 P.3d 993 (2005); *State v. Coates*, 107 Wn.2d 882, 886-89, 735 P.2d 64 (1987). The *Winterstein* court explained the distinction between these two exceptions:

> The independent source doctrine is much different from the inevitable discovery doctrine. The independent source doctrine recognizes that probable cause may exist based on legally obtained evidence; the tainted evidence, however, is suppressed . . . .
>
> In contrast, the inevitable discovery doctrine is necessarily speculative and does not disregard illegally obtained evidence.

*Winterstein*, 167 Wn.2d at 634. Thus, the *Winterstein* court concluded, the inevitable discovery exception is "incompatible with the nearly categorical exclusionary rule under article I, section 7." *Winterstein*, 167 Wn.2d at 636. The *Afana* court subsequently rejected the good faith exception for these same reasons: "Like inevitable discovery, the State's proposed 'good faith' exception does not disregard illegally obtained evidence." *Afana*, 169 Wn.2d at 181.

¶73 A majority of our Supreme Court has not expressly adopted the attenuation doctrine under article I, section 7. Recently, three members of the court applied the doctrine in a case where the police illegally arrested the defendant, advised him of his *Miranda*[15] rights, and then questioned him at the police station. *State v. Eserjose*, 171 Wn.2d 907, 259 P.3d 172 (2011). The defendant initially denied committing the burglary but after the police told him that his

---

[15] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

partner in the crime had confessed, he admitted his involvement. *Eserjose*, 171 Wn.2d at 911. Three members of the lead opinion adopted the federal rule that such a confession is admissible if the record demonstrates that the "confession is sufficiently an act of free will to purge the taint of an illegal arrest." *Eserjose*, 171 Wn.2d at 922-23. One justice concurred in the lead opinion result and another justice concurred in the result but did not join the lead opinion's application of the attenuation doctrine because it was not necessary to the result. *Eserjose*, 171 Wn.2d at 929, 930 (Madsen, C.J., concurring). Four dissenting justices found the attenuation doctrine incompatible with Washington's nearly categorical exclusionary rule under article I, section 7. *Eserjose*, 171 Wn.2d at 934 (C. Johnson, J., dissenting). The lead opinion found that Eserjose's confession was free of taint because the circumstances of the arrest were not egregious, the confession was not compromised by a prior confession, and Eserjose's confession was not the product of his emotional distress. *Eserjose*, 171 Wn.2d at 914-15, 923-24. But even if we apply the lead opinion reasoning here, it would not justify the officers' visit to and entry of the room, however minimal, by knocking and getting Smith to open the door. First, the lead opinion applied two attenuation factors—passage of time and presence of intervening circumstances—and explained that "[i]f evidence is obtained 'without authority of law,' i.e., while the violation is ongoing, no time will have passed and no circumstances will have intervened, in which case the evidence will not be attenuated." *Eserjose*, 171 Wn.2d at 927. The lead opinion found that the officers obtained Eserjose's confession with the "authority of law" because they had probable cause to arrest Eserjose, and the illegality of the arrest—the officers' entry without permission in part of the home where Eserjose was actually arrested—was not an operative fact in obtaining the confession. *Eserjose*, 171 Wn.2d at 926. Here, the illegal visit to Smith's room followed immediately

after their illegal search of the motel registry.[16] And no intervening circumstances attenuated the illegal visit from the illegal search, i.e., the officers had no reason to visit the room other than the illegally obtained evidence.

¶74 I agree with the *Eserjose* dissenters that the attenuation doctrine is incompatible with our " 'nearly categorical' " exclusionary rule and our Supreme Court's express disapproval of exceptions that admit illegally obtained evidence. *Afana*, 169 Wn.2d at 180 (quoting *Winterstein*, 167 Wn.2d at 636). By attempting to quantify exactly how "tainted" the fruits of an unlawful search may be and determine whether the taint has been sufficiently dissipated to avoid suppression, we undermine our strict exclusionary rule, ignore the automatic nature of the remedy, and allow the admission of evidence obtained from an illegal search. Moreover, even if we apply *Eserjose*'s lead opinion analysis, the officers' visit to and entry of Smith's room is not attenuated from the illegal search; the officers obtained the evidence and statements only by exploiting the illegality of the registry search.

¶75 Finally, I believe *State v. Ibarra-Cisneros* controls our decision. *State v. Ibarra-Cisneros*, 172 Wn.2d 880, 263 P.3d 591 (2011). In *Ibarra-Cisneros*, the court held that "[c]ourts should not consider grounds to limit application of the exclusionary rule when the State at a CrR 3.6 hearing offers no supporting facts or argument." *Ibarra-Cisneros*, 172 Wn.2d at 885. Here, the State argued that the search was justified under the inevitable discovery doctrine, and the trial court limited its findings and conclusions to that doctrine, ruling that "[a]rticle I, [s]ection 7 of the Washington State Constitution is not violated by applying the doctrine of 'inevitable discovery' to the facts of this particular case." Clerk's Papers at 493. The majority attempts to

---

[16] The majority misapplies the "passage of time" factor to the time between the officers' search of the registry and the victims' testimony. The time is measured between the illegal search and the officers' immediate discovery of the new crimes. *Eserjose*, 171 Wn.2d at 927-28.

distinguish *Ibarra-Cisneros* by asserting that the record here was sufficiently developed for us to consider the doctrines of attenuation and independent source. But the parties did not litigate the elements of attenuation, and the trial court made no findings or conclusions that would apply to the elements of that doctrine. If the trial court had considered attenuation, it would have applied the passage-of-time and presence-of-intervening-circumstances factors; where the violation is ongoing, no time will have passed and no circumstances will have intervened. *Eserjose*, 171 Wn.2d at 927-28. The unlawful search of the motel registry occurred minutes before the illegal entry into the motel room. And the record reveals no intervening circumstances. Thus, to the extent the record was developed, it would support only that the room entry was not attenuated from the illegal registry search.

## II. INDEPENDENT SOURCE

¶76 I also disagree with the majority's application of the independent source doctrine. The majority relies on *State v. Miles*, 159 Wn. App. 282, 244 P.3d 1030, *review denied*, 171 Wn.2d 1022 (2011), which, in turn, relies on *Gaines*, 154 Wn.2d at 716-21, and *Murray v. United States*, 487 U.S. 533, 108 S. Ct. 2529, 101 L. Ed. 472 (1988).[17] Each of these cases involved a situation where law enforcement officers discovered evidence pursuant to an unlawful search; recognized their error; obtained a search warrant based on independent, untainted information; and subsequently seized the evidence pursuant to that warrant. *Murray*, 487 U.S. at 535-36; *Gaines*, 154 Wn.2d at 712-15; *Miles*, 159 Wn. App. at 284. In each case, the court held that a subsequent search is lawful where (1) it is based on untainted information obtained independently from the initial, unlawful search

---

[17] Although *Murray* addresses Fourth Amendment violations and the federal exclusionary rule, our Supreme Court has recognized *Murray* as "controlling authority" when analyzing the independent source doctrine under an article I, section 7 violation. *Gaines*, 154 Wn.2d at 721.

and (2) the State's decision to seek a warrant was not motivated by their discoveries during the initial, unlawful search. *Murray*, 487 U.S. at 542; *Gaines*, 154 Wn.2d at 718-21; *Miles*, 159 Wn. App. at 291-94.

¶77 For example, in *Gaines* a man reported that he had been abducted by the defendants and held against his will for two days while they drove him to multiple banks and attempted to force him to withdraw money. *Gaines*, 154 Wn.2d at 713-14. Police officers spotted the defendants' car and arrested them, conducted a warrantless search of the car, and discovered an assault rifle in the trunk. *Gaines*, 154 Wn.2d at 714. The officers closed the trunk without disturbing its contents, obtained a search warrant for the defendants' house and car, and seized the rifle during a subsequent search pursuant to that warrant. *Gaines*, 154 Wn.2d at 714-15. Our Supreme Court first addressed whether the independent source doctrine is a valid exception to the exclusionary rule under article I, section 7, and held that it was. *Gaines*, 154 Wn.2d at 716-18. The court then held that the subsequent search was valid because even after striking all references to the illegal search of the trunk, independent and legally obtained information supported the warrant. *Gaines*, 154 Wn.2d at 718-20. Also, the trial court's findings adequately supported the conclusion that the officers were not motivated to seek a warrant because of the unlawful search, but would have sought a warrant for the car based on facts gathered independently from the illegal search. *Gaines*, 154 Wn.2d at 721.

¶78 In contrast, this case does not involve a situation where officers discovered evidence pursuant to an unlawful search; obtained a warrant based on untainted information wholly independent from the initial, illegal search; and subsequently seized the evidence pursuant to a valid warrant. The officers here discovered evidence of the assault on Quianna Quabner during the course of a single, continuous illegal search. The majority characterizes the officers' entry into the motel room as a subsequent, independent search

because it was motivated by their open view observations of the assault rather than their unlawful discovery of the warrant for Smith's arrest. But absent the initial, unlawful search of the motel guest registry, the officers had no independent basis for knocking on Smith's door. Absent an open door, the officers would have had no opportunity to observe the interior of Smith's motel room. Their observations stemmed directly from the initial, illegal search.

¶79 Had the officers attempted to obtain a warrant to search Smith's motel room, they could not have produced any untainted, independently obtained information to support the warrant. Nor could they demonstrate that they would have been motivated to seek a warrant absent the initial, unlawful search. Accordingly, the State has failed to satisfy the requirements of the independent source exception. *Murray*, 487 U.S. at 542; *Gaines*, 154 Wn.2d at 718-21; *Miles*, 159 Wn. App. at 291-94.

Review granted at 173 Wn.2d 1034 (2012).