[No. 61474-6-I.   Division One.   January 10, 2011.]

THE STATE OF WASHINGTON, *Petitioner*, v. MICHAEL M. MILES, *Respondent*.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Ivan Orton, Deputy*, for petitioner.

*Casey Grannis* (of *Nielsen Broman & Koch PLLC*), for respondent.

¶1 SCHINDLER, J. — In *State v. Miles*, 160 Wn.2d 236, 252, 156 P.3d 864 (2007), the Washington Supreme Court held that the issuance of an administrative subpoena for the bank records of Michael M. Miles by the Washington State Securities Division of the Department of Financial Institutions (Securities Division) under The Securities Act of Washington, chapter 21.20 RCW, violated Miles's right to privacy under article I, section 7 of the Washington State Constitution. After the mandate issued, the State filed an application for a search warrant to obtain bank records related to the initial complaint filed against Miles with the Securities Division. After a superior court judge issued the search warrant, the trial court granted the defense motion to suppress. The trial court ruled the independent source exception did not allow the State to obtain the bank records because there was no evidence the State would have "come upon the evidence other than from referral by the Securities Division after its flawed investigation." Under the independent source exception, an unlawful search does not invalidate a subsequent search if (1) the issuance of the search warrant is based on untainted, independently obtained information and (2) the State's decision to seek the warrant is not motivated by the previous unlawful search and seizure. Here, there is no dispute that the search warrant application to obtain bank records was based on untainted evidence and did not contain any information learned from the illegal search and seizure. Because it is not clear that

the trial court used the correct legal standard in analyzing the independent source exception, and the court did not address the question of whether the State's decision to seek the warrant was motivated by evidence obtained in the previous unlawful search, we remand.

## FACTS

¶2 Michael Miles worked for Primerica Financial Services as an insurance salesman. Julie Gillette works as a teacher. Gillette met Miles in 1998 through a friend. Although he was not licensed to sell securities, Miles purported to be a securities broker and investment manager. Miles told Gillette that he was an investment specialist with an expertise in commodities and that he could achieve much higher returns than she was receiving from her current investments. Miles said that he could double her money in 12 to 18 months. According to Gillette, Miles also told her that she would never be able to buy property or send her children to college if she did not change her investment strategy. After Gillette repeatedly told Miles that she was reluctant to invest her money with him, "[Miles] told me he would write a letter documenting the fact that the principle [sic] would be guaranteed. This was the most important statement he made which swayed me to invest."

¶3 A document written on the letterhead of "MM Miles," dated October 23, 1999, verifies that on that date Gillette invested $85,000 with Miles for 12 to 18 months to "maximize growth and income" by using "Initial Investment Strategy: Options in stocks/commodities." The document sets forth his guarantee to return the principal to Gillette.

MM Miles is a private investment firm created to maximize profits for its clients by using heretofore non-traditional methods with a minimum of risk. To such an end MM Miles guarantees the return of principal to all who are involved with the program. While we cannot guarantee actual results we do on a regular basis double our clients['] profits over a twelve to

eighteen month period. We are able to that [sic] because we use strategies that continually keep us in markets that are making excellent moves as opposed to the traditional buy and hold philosophy that governs most people[']s investment attempts at investing. This type of environment will not last forever but we make the most of it while we can. MM Miles manages and invests directly, we do not necessarily use mutual funds or any one particular investment. It gives us a flexibility with our clients['] funds that allow us to maximize profits.

¶4 Gillette wrote checks to MM Miles in 1999 totaling $124,000: a check dated October 23, 1999 for $85,000, a check dated November 1, 1999 for $27,000, and a check dated December 7, 1999 for $12,000. Miles endorsed and deposited each of the checks into his account with Washington Mutual Bank. Despite repeated requests, Miles did not provide any investment statements to Gillette. However, Miles repeatedly assured Gillette that he would return the money she invested.

¶5 On April 23, 2001, Gillette filed a complaint against Miles with the Securities Division. Gillette provided a sworn statement, a copy of the guarantee, and copies of the three checks that she wrote to MM Miles in 1999.

¶6 On June 13, 2001, the Securities Division issued an administrative subpoena, as authorized under RCW 21.20.380, to Washington Mutual Bank for Miles's bank records from January 1996 through June 2001.[1] The Securities Division did not inform Miles about the subpoena and

---

[1] RCW 21.20.380 of the Securities Act provides, in pertinent part:

(1) For the purpose of any investigation or proceeding under this chapter, the director or any officer designated by the director may administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, and require the production of any books, papers, correspondence, memoranda, agreements, or other documents or records which the director deems relevant or material to the inquiry.

. . . .

(3) A subpoena issued to a financial institution under this section may, if the director finds it necessary or appropriate in the public interest or for the protection of investors, include a directive that the financial institution subpoenaed shall not disclose to third parties that are not affiliated with the financial institution, other than to the institution's legal counsel, the existence or content of the subpoena.

instructed Washington Mutual to not do so. Washington Mutual complied with the subpoena and produced the records. The bank records showed that between 1997 and May 2001, Miles defrauded a number of women, including Gillette, of nearly $400,000. The bank records also showed that Miles used the money he obtained for investments to pay living expenses and to make partial payments to some of the victims.

¶7 In November 2003, the State charged Miles with eight counts of securities fraud, several counts of intimidation and tampering with a witness, one count of forgery, and three counts of theft. The information described in detail his scheme to defraud the eight women.

¶8 Miles filed a motion to suppress the bank records and the evidence obtained by means of the administrative subpoena, "with the exception of Ms. Gillette's testimony and the initial records tendered [by Gillette]." The defense argued that the administrative subpoena violated his right to privacy under article I, section 7 of the Washington State Constitution. The court ruled that the bank records were protected under article I, section 7, but denied the motion to suppress based on the "pervasively regulated industry" warrant exception.[2]

¶9 The Washington State Supreme Court reversed.[3] The court held that without prior judicial review, issuance of an administrative subpoena under the Securities Act violated article I, section 7 of the Washington State Constitution. However, the court expressly notes that the State "already validly possessed the canceled checks from Gillette along with her statement, which supports the filing of some charges."[4]

¶10 After the mandate issued, the State filed an application for a search warrant to obtain bank records limited

[2] *Miles*, 160 Wn.2d at 242.

[3] *Miles*, 160 Wn.2d at 252.

[4] *Miles*, 160 Wn.2d at 252.

to Gillette's initial complaint. The State asked the court to issue a search warrant to Washington Mutual Bank for Miles's bank records for only November and December 1999.

¶11 In support of the search warrant, the State submitted the affidavit of Detective Chris Hansen of the Seattle Police Department Fraud, Forgery, and Financial Exploitation Unit, and the affidavit of a senior King County prosecuting attorney from the Fraud Division. The detective's affidavit includes a copy of Gillette's complaint, her sworn statement, and the three checks that she wrote to Miles in October to December 1999.

¶12 The prosecutor's affidavit sets forth the history of the case, including the prior seizure of the bank records based on the administrative subpoena issued by the Securities Division and the supreme court's decision in *Miles*. The prosecutor's affidavit also addresses the question of whether the State would have applied for a search warrant to obtain the bank records if the Securities Division did not have the authority to issue an administrative subpoena.

> Had the subpoena provision of RCW 21.20.380 not been available these records would have been obtained in some other legal fashion. The decision to seek the records sought by this warrant is not based on any information contained within the records previously obtained. The need for the records is apparent based on the facts of [Gillette's] initial complaint to the Securities Division.

¶13 The superior court judge found probable cause that Miles committed the crime of security fraud and issued a search warrant authorizing the State to obtain the bank records from Washington Mutual for November and December 1999. Specifically:

- Signature cards
- Monthly statements
- Withdrawal items including offsets
- Deposit slips and deposit items including offsets

- Information on any loans including applications
- Correspondence

¶14 After obtaining the search warrant, the State asked the trial court to issue a subpoena for the bank records. In response, Miles filed a motion to dismiss or, in the alternative, to suppress the bank records. Miles did not dispute that the State did not rely on any evidence obtained from the administrative subpoena previously issued by the Securities Division in obtaining the search warrant. Miles argued that the independent source exception did not apply because the State could not establish that "the government would have sought a constitutional warrant even without the unlawful search." The State argued that the evidence was admissible under the independent source exception because the State was not motivated to seek the warrant by any information obtained from the prior illegal search and seizure of the bank records.

¶15 The trial court denied the motion to dismiss but granted the motion to suppress. The court ruled that the independent source exception did not allow the State to later obtain the bank records with a judicially issued search warrant.[5] The court's findings state, in pertinent part:

1.  The Washington Mutual Bank records obtained initially by the Washington Securities Division pursuant to subpoena issued on June 13, 2001 were acquired by unconstitutional means because they contained private affairs protected by article I, section 7 of the Washington Constitution and were searched without a judicially issued warrant or subpoena. *State of Washington v. Miles*, 160 Wn.2d 236 (2007).

2.  The independent source rule does not authorize the State to reacquire the records from Washington Mutual Bank with a judicially issued warrant or subpoena because there is no evidence the State would have come upon the evidence

---

[5] The trial court denied Miles's motion to dismiss based on the supreme court's determination that Gillette's complaint supported the filing of some charges. *See Miles*, 160 Wn.2d at 252.

other than from referral by the Securities Division after its flawed investigation.

3. Consequently, the bank records re-acquired pursuant to the judicially issued warrant or second subpoena were also gained by unconstitutional means.

¶16 The State filed a motion for reconsideration. The State argued the trial court used an erroneous legal standard in determining that the independent source exception applied and the court did not address the question of whether the State was improperly motivated to seek the warrant by the previous illegal search and seizure. In support, the State submitted the declaration of the Chief of Enforcement for the Securities Division Martin Cordell. Cordell testified that if the Securities Division did not have statutory administrative subpoena authority when Gillette filed her complaint, it would have asked Miles to voluntarily provide his bank records; and if Miles had declined, the Securities Division would have "referred the matter to the Prosecutor's Office." The trial court denied the motion to reconsider. Based on the stipulation of the parties, the court entered an order dismissing the charges.

¶17 The State filed a motion for discretionary review of the trial court order granting the motion to suppress under RAP 2.3(b). A commissioner of this court granted the motion for discretionary review.

## ANALYSIS

¶18 The State contends the trial court erred in granting the motion to suppress. The State asserts the court used the wrong legal standard in concluding the independent source exception does not allow the State to obtain bank records related to Gillette's initial complaint to the Securities Division. Miles argues that (1) the independent source exception applies only if the State does not seize evidence during the initial illegal search; (2) the State did not obtain the bank records through information that was "wholly independent of the initial illegality"; and (3) the State did

not show that absent the illegal search and seizure, it would have applied for a search warrant.[6]

¶19 We review conclusions of law related to a motion to suppress de novo. *State v. Levy*, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006). We review findings of fact for substantial evidence. *Levy*, 156 Wn.2d at 733.

¶20 Evidence that is obtained from an illegal search and seizure is subject to suppression under the exclusionary rule. *State v. Gaines*, 154 Wn.2d 711, 716-17, 116 P.3d 993 (2005). Under the exclusionary rule, evidence must be suppressed unless the relationship between the illegal search and seizure and the evidence obtained is sufficiently attenuated so as to dissipate the taint. *Wong Sun v. United States*, 371 U.S. 471, 491, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *State v. Spotted Elk*, 109 Wn. App. 253, 262, 34 P.3d 906 (2001).

¶21 The independent source doctrine is a well-established exception to the exclusionary rule. In an early Supreme Court case, *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S. Ct. 182, 64 L. Ed. 319 (1920), the Court held that the exclusionary rule applies not only to illegally obtained evidence, but also to derivative incriminating evidence. However, the Court emphasized that if knowledge of such facts is gained from an independent source, the evidence obtained by unlawful government action need not be suppressed. *Silverthorne*, 251 U.S. at 392.

¶22 In *Gaines*, our supreme court recognized the independent source doctrine as a long-accepted exception to the exclusionary rule but, for the first time, expressly addressed whether the independent source exception violates

---

[6] Miles also argues that the trial court properly granted the motion to suppress based on the inevitable discovery rule rather than the independent source exception. The record does not support this argument. Below, Miles did not argue that the court should suppress based on inevitable discovery. Miles took the position that the decision in *Murray v. United States*, 487 U.S. 533, 536, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988), controlled but the State could not show that the decision to reacquire the bank records was " 'genuinely independent' " of the prior illegality. The briefs, the arguments, and the court's decision focused exclusively on the independent source exception.

article I, section 7 of our state constitution. *Gaines*, 154 Wn.2d at 717.

¶23 In *Gaines*, a police officer conducted a warrantless search of a car and the trunk of the car incident to the defendant's arrest. In the trunk, the officer saw what appeared to be an assault rifle and ammunition. The officer impounded the car. The next day, a different officer applied for a warrant to search the trunk of the car. The affidavit in support of the warrant states that an officer observed a weapon in the trunk. The trial court ruled that the evidence was admissible under the inevitable discovery doctrine, reasoning that even if the initial illegal search of the trunk had not occurred, the rifle would have inevitably been discovered " 'through the course of predictable police procedures.' " *Gaines*, 154 Wn.2d at 715.

¶24 The supreme court affirmed the trial court's decision that the evidence was admissible not under the inevitable discovery doctrine but, rather, under the independent source exception. The court held that admission of evidence under the independent source exception complies with article I, section 7. The court concluded that the "subsequent search [was] conducted pursuant to a warrant based on information obtained independently from the [prior illegal] glance." *Gaines*, 154 Wn.2d at 717. The court decided the search was permissible even though the search warrant included information gleaned from the prior illegal search because the affidavit contained sufficient untainted facts to establish probable cause without regard to the unlawfully obtained information. *Gaines*, 154 Wn.2d at 718.

¶25 In analyzing the application of the independent source exception to the facts of the case, the court states that the United States Supreme Court's decision in *Murray v. United States*, 487 U.S. 533, 108 S. Ct. 2529, 101 L. Ed. 472 (1988) "is [the] controlling authority" defining the contours of the independent source exception. *Gaines*, 154 Wn.2d at 721.

¶26 In *Murray*, while federal agents were conducting surveillance of a warehouse, two trucks left the warehouse.

The agents seized the trucks and discovered marijuana. The agents then entered the warehouse and saw burlap-covered bales. *Murray*, 487 U.S. at 535-36. The agents did not disturb the bales but continued to keep the warehouse under surveillance while they obtained a search warrant. In the search warrant application, the agents did not inform the magistrate of the warrantless entry or what they observed in the warehouse. After obtaining the search warrant, the agents reentered the warehouse and discovered that the burlap-covered bales contained marijuana. The agents seized the marijuana along with other incriminating evidence.

¶27 In a motion to suppress, the defendants argued that the independent source exception applies only to evidence obtained during an independent lawful search. *Murray*, 487 U.S. at 537. The government argued the exception applies to evidence initially discovered as a consequence of an unlawful search but then later obtained by measures untainted by the initial illegal search. *Murray*, 487 U.S. at 537.

¶28 The Court held that the independent source exception applied and allowed admission of the marijuana "that had been observed in plain view at the time of a prior illegal entry." *Murray*, 487 U.S. at 535. The Court concluded that evidence obtained through an independent source is not subject to the exclusionary rule because the " 'exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.' " *Murray*, 487 U.S. at 537 (quoting *Nix v. Williams*, 467 U.S. 431, 443, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984)).

> "[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position tha[n] they would have been in if no police error or misconduct had occurred . . . . When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation."

*Murray*, 487 U.S. at 537 (alterations in original) (quoting *Nix*, 467 U.S. at 443).

¶29 The Court states the determinative question is whether the later, purportedly lawful search—as compared to the initial unlawful search—"was in fact a genuinely independent source of the information and tangible evidence at issue" here. *Murray*, 487 U.S. at 542. The Court concluded that the search would not have been genuinely independent "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Murray*, 487 U.S. at 542 (footnote omitted). Thus, under *Murray*, the analysis of whether the independent source exception applies requires separate inquiries into (1) the effect of illegally obtained information on the decision of the state agents to seek a warrant and (2) the magistrate's decision to issue a warrant. *Murray*, 487 U.S. at 542.

¶30 In *Murray*, there was no dispute that the illegal search " 'in no way contributed' " to the issuance of the warrant or to the discovery of the evidence during the lawful search. *Murray*, 487 U.S. at 542-43 (quoting *United States v. Moscatiello*, 771 F.2d 589, 603 (1st Cir. 1985)). However, because the trial court did not expressly determine whether the officers were motivated to seek the warrant by the earlier unlawful entry, and the record was not sufficiently developed, the Court remanded. *Murray*, 487 U.S. at 543.

¶31 Miles's argument that the independent source exception can apply only where information is illegally discovered but no tangible evidence is seized during the illegal search was rejected in *Murray*.

> The First Circuit has discerned a difference between tangible and intangible evidence that has been tainted, in that objects "once seized cannot be cleanly reseized without returning the objects to private control." *United States* v. *Silvestri*, 787 F.2d [736,] 739 [(1st Cir. 1986)]. It seems to us, however, that reseizure of tangible evidence already seized is no more impos-

sible than rediscovery of intangible evidence already discovered. The independent source doctrine does not rest upon such metaphysical analysis, but upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would otherwise have occupied. So long as a later, lawful seizure is genuinely independent of an earlier, tainted one (which may well be difficult to establish where the seized goods are kept in the police's possession) there is no reason why the independent source doctrine should not apply.

*Murray*, 487 U.S. at 541-42. The independent source exception applies where the government lawfully seizes evidence that was originally seized by means of an unlawful search "[s]o long as [the] later, lawful seizure is genuinely independent of [the] earlier tainted one." *Murray*, 487 U.S. at 542.[7]

¶32 Miles further claims that the independent source exception does not apply in this case because the seizure of bank records "stems directly or indirectly from the unlawful search" and is the "product of unconstitutional action." The supreme court rejected a similar argument in *Gaines*:

[P]etitioners argue that exclusion of the trunk's contents is mandatory and that allowing a later warrant to authorize introduction of evidence first discovered by the police as a result of an illegal act would vitiate constitutional protections.

*Gaines*, 154 Wn.2d at 720. The court held that even if "some exclusionary remedy is appropriate," excluding the tainted evidence from the warrant affidavit and then evaluating whether the warrant was supported by probable cause "finely balances the rights of the accused with society's interest in prosecuting criminal activity and ensures

---

[7] *Gaines* also does not support Miles's argument that the independent source exception applies only if the evidence is seized. Although the court noted that the rifle the officer observed in the trunk was not seized at the time of the illegal search, that fact was not determinative. The court concluded the evidence was admissible because it was obtained by an independent source and the search warrant was supported by probable cause after excluding the illegally obtained information about the contents of the trunk. *Gaines*, 154 Wn.2d at 720; *see also State v. Winterstein*, 167 Wn.2d 620, 634, 220 P.3d 1226 (2009) (When evaluating a warrant based, in part, on information learned in a warrantless search, the tainted information must be excluded.).

that the State is placed in neither better nor worse position as a result of the officers' improper actions." *Gaines*, 154 Wn.2d at 720.

¶33 Here, there is no dispute as to the first prong under *Murray*. The information obtained by means of the administrative subpoena was not included in the affidavit in support of the later search warrant and, consequently, did not affect the decision to issue the warrant. The facts contained in the search warrant and the supporting affidavits were based solely on Gillette's initial complaint to the Securities Division prior to the invalid search. There is also no dispute there was probable cause to support issuance of the search warrant for the bank records related to Gillette's complaint.

¶34 The parties' dispute focuses on whether the trial court applied the correct legal standard in evaluating the second prong of the analysis under *Murray*. The State argues that the superior court judge properly issued the subpoena for bank records related solely to Gillette's complaint under the independent source exception. The State asserts that the trial court used an incorrect legal standard, akin to the inevitable discovery doctrine, in finding "there is no evidence that [the] State would have come upon the evidence other than from referral by The Securities Division after its flawed investigation." Miles contends the trial court applied the correct legal standard in granting the motion to suppress the bank records because the court found that absent the illegal search, the State would not have sought a warrant.

¶35 The Court in *Murray* uses two different formulations of the motivation prong: (1) whether "the agents' decision to seek the warrant was prompted by what they had seen during the initial entry," and (2) whether "the agents would have sought a warrant if they had not earlier entered the warehouse." *Murray*, 487 U.S. at 542-43.

¶36 The trial court's finding that the bank records were not admissible under the independent source doctrine "because there is no evidence that [the] State would have come

upon the evidence other than from referral by the Securities Division after its flawed investigation" does not address either formulation of the motivation prong under *Murray*. That is, whether the State's decision to seek the warrant was prompted by the illegal search or whether the State would have sought a warrant if the Securities Division was not authorized to do so.

¶37 Moreover, focusing on whether the State would have "come upon" the evidence appears to address whether the State would have inevitably discovered the evidence by other legal means. In contrast to the independent source doctrine that allows admission of legally obtained evidence despite a prior illegal search and seizure, the inevitable discovery doctrine allows the government to use evidence that it obtained illegally but *would have* obtained legally in any event. *Murray*, 487 U.S. at 536-37.

¶38 In *Winterstein*, our supreme court rejected the inevitable discovery doctrine as "incompatible with the nearly categorical exclusionary rule under article I, section 7." *State v. Winterstein*, 167 Wn.2d 620, 636, 220 P.3d 1226 (2009). However, while rejecting the inevitable discovery doctrine as an exception to the exclusionary rule, the court expressly distinguishes the well-established independent source exception. *Winterstein*, 167 Wn.2d at 631. "The independent source doctrine recognizes that probable cause may exist based on legally obtained evidence; the tainted evidence, however, is suppressed . . . . In contrast, the inevitable discovery doctrine is necessarily speculative and does not disregard illegally obtained evidence." *Winterstein*, 167 Wn.2d at 634; *see also State v. Afana*, 169 Wn.2d 169, 181, 233 P.3d 879 (2010).

¶39 The State cites to factually analogous federal cases to argue the independent source exception applies. In those cases, the record showed that a court ruling that the initial search was either illegal or invalid prompted the state agents to seek a warrant. *See United States v. Hanhardt*, 155 F. Supp. 2d 840, 848-49 (N.D. Ill. 2001) (the court determined the state agents were not motivated by what

they illegally discovered and the evidence was admissible under the independent source doctrine); *United States v. Johnson*, 994 F.2d 980, 987 (2d Cir. 1993) ("the warrant application was prompted not by the prior review but by the obvious relevance of the tapes and the district court's indication that a warrant was necessary"); *United States v. Mulder*, 889 F.2d 239, 241 (9th Cir. 1989) (the motivation to seek the warrant was the outcome of the appeal process and independent of the initial search).

¶40 Likewise here, there is evidence in the record that shows the supreme court's decision in *Miles* prompted the State to seek a warrant. But because the determination of whether the motivation prong is met is a question of fact, and the trial court did not address the motivation prong under *Murray*, we remand. *See State v. Spring*, 128 Wn. App. 398, 405-06, 115 P.3d 1052 (2005).

BECKER and ELLINGTON, JJ., concur.