# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>WILLIAM PHILLIP, JR,<br><br>Petitioner. | No. 82748-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

BIRK, J. — William Phillip seeks review of a May 14, 2021 oral ruling and July 14, 2021 written findings and conclusions denying his CrR 3.6 motion to suppress evidence obtained from his cell phone provider, which included cell site location information (CSLI). The State originally obtained the evidence pursuant to a 2010 warrant, and later pursuant to a 2012 warrant based on a more thorough affidavit, after which Phillip was convicted of first degree murder. On appeal, this court found the 2010 and 2012 warrants lacked probable cause, and we reversed Phillip's conviction. State v. Phillip, No. 72120-8-I, slip op. at 7, 12 (Wash. Ct. App. Aug. 23, 2016) (Phillip I) (unpublished), https://www.courts.wa.gov/opinions/pdf/721208.pdf. Following our first remand, the State served a subpoena for the evidence, which we held did not meet the warrant requirement. State v. Phillip, 9 Wn. App. 2d 464, 481, 452 P.3d 553 (2019) (Phillip II). Following our second remand, the State obtained a new 2020 warrant for the same evidence, based on an affidavit describing facts it contends were learned independently from Phillip's

cell phone records. We conclude the 2020 warrant is valid under Washington's independent source doctrine. Accordingly, we affirm and remand for proceedings not inconsistent with this opinion.

I

A

On May 22, 2010, Bonny Johnson, the girlfriend of Seth Frankel, became concerned that she had not heard from Frankel, who had plans to leave for a camping trip that morning. Johnson contacted Frankel's neighbor and requested he check on Frankel. The neighbor looked through a window and saw a person lying on the living room floor and called 911. Firefighters entered and found Frankel deceased, with wounds that did not appear to be self-inflicted. There was an 18 inch black zip tie around Frankel's right wrist. A second zip tie was found under an overturned coffee table near Frankel's body. There was only limited disturbance of the home, and valuable items remained in place. The King County Medical Examiner's office determined that Frankel died from incised wounds on his neck caused by a sharp instrument and estimated Frankel's time of death as 9:00 p.m. on May 21, 2010.

Detectives interviewed Johnson on May 22, 2010. She stated she and Phillip were co-workers and had previously dated. Johnson told detectives Phillip had not taken their breakup well, had recently expressed love for her, and was the only person she knew who had spoken ill of Frankel. Johnson told police Phillip previously served in the military and owned a motorcycle. With both Johnson's consent and a search warrant, detectives obtained Johnson's cellular phone

records on May 25, 2010. Police viewed text messages between Johnson and Phillip that appeared to be flirtatious and in which Phillip referred to Frankel as an "unhot old man."

On May 25, 2010, a Portland police detective went to Phillip's residence in Oregon to speak with him. In seeking the present warrant, police stated in the supporting affidavit that Phillip admitted to knowing Johnson, but claimed she was " 'just a friend.' " A finding of fact in the order on Phillip's CrR 3.6 motion states, "Phillip failed to mention that he had been in very recent contact with Johnson via text messaging." However, the Portland detective testified at Phillip's trial that Phillip volunteered he recently communicated with Johnson via text message during this conversation. When the detective asked Phillip if he had been to Auburn, Washington recently, Phillip replied, " 'I would like to exercise my right to counsel.' "

On May 26, 2010, Auburn detectives spoke with Johnson again. When asked if she could think of anyone who would want to hurt Frankel, she said, " 'All I can think of is [Phillip].' " She explained that Phillip was extremely upset when she broke up with him, and that she may have been leading Phillip on by continuing to tell him that she cares about him. She nevertheless expressed doubt that Phillip would have killed Frankel.

On May 27, 2010, Auburn police sought a search warrant for cell phone records associated with Phillip's cell phone number, including subscriber information, billing records, cell tower site records, text messages, and call logs,

3

for the time period between April 1, 2010 and May 26, 2010. The superior court approved the warrant.

On May 28, 2010, Auburn detectives contacted Phillip at his residence in Portland. Detectives noticed bruising on the fingers of Phillip's right hand and a blood-stained bandage over the webbing between his thumb and index finger. Phillip attempted to keep his right hand concealed. When asked about it, Phillip stated he had injured his hand at work. Detectives contacted Phillip again on June 2, 2010. When he answered the door, he did not have a bandage on his right hand, and detectives observed a cut where the bandage had been a few days before. Phillip agreed to meet in the common room of his building, and when he arrived he had covered the cut with a bandage.

On June 9, 2010, detectives went to the convention center where Phillip worked. Phillip's supervisor confirmed he was employed there. Detectives learned that Phillip had access to 18-inch zip ties and commonly used them in his job duties. A co-worker confirmed Phillip injured his right hand at work but stated the injury did not involve a cut.

On June 20, 2010, Phillip's wireless carrier provided Phillip's cell phone records to Auburn police. This information included CSLI from Phillip's cell phone. Auburn police reviewed the information they received. The CSLI showed that on the night of the murder, Phillip's cell phone connected to a series of cell sites suggesting travel from Portland to Auburn, near Frankel's residence, and back to Portland again. The records showed that Phillip made a phone call at 8:56 p.m. that originally connected through a cell site near Frankel's residence, lasted 2

4

minutes 3 seconds, and ended while connected through a cell site in Auburn by State Route 18 between I-5 and State Route 167. Two days later, on June 22, 2010, Police sought and were granted a search warrant for Phillip's apartment, motorcycle, and person.[1] The same day, they sought and obtained a search warrant for Phillip's e-mail account and search of "Verizon records" for information concerning the cell phone number Phillip dialed at 8:56 p.m. on the night of the murder. Phillip I, No. 72120-8-I, slip op. at 13-14.

On September 23, 2010, Washington State Patrol Crime Laboratory Forensic Scientist Amy Smith analyzed a bloodstained towel found at the crime scene and concluded it contained a mixed deoxyribonucleic acid (DNA) profile consistent with having originated from two individuals. One profile matched Frankel. The second was determined to be from an unknown male. On November 5, 2010, police obtained a search warrant to seize a sample of Phillip's DNA. The affidavit contained information obtained from Phillip's cell phone records. In a report dated December 8, 2010, Smith concluded that only approximately 1 in 2.2 million individuals could have contributed to the second DNA sample and that Phillip was within that set.

On March 22, 2012, at the suggestion of the deputy prosecuting attorney, police sought and were granted a second warrant for the same cell phone records that they had obtained under the May 27, 2010 warrant. The affidavit incorporated

---

[1] Although not mentioned by the authorities in their affidavit for the 2020 warrant, the search of Phillip's apartment further disclosed, "[i]n his journal, Phillip expressed that he was obsessed with Johnson and that Frankel was not good enough for her." Phillip II, 9 Wn. App. 2d at 469.

by reference the facts in the May 27, 2010 affidavit, and included additional information that was known to police on May 27, 2010, but had not been included in the warrant. Police obtained a second copy of the same cell phone records from Phillip's wireless carrier.

The State charged Phillip with first degree murder. A first trial ended in a hung jury. In a second trial, a jury convicted Phillip of first degree murder. Phillip appealed.

B

In Phillip I, this court held the 2010 and 2012 warrants for Phillip's cell phone records were not supported by probable cause, reversed his conviction, and remanded. No. 72120-8-I, slip op. at 1. We further suppressed information concerning the phone number Phillip had dialed the night of the murder, stating, "The phone number was known to police from Phillip's unlawfully obtained phone records." Id. at 15. However, based on the independent source doctrine, we concluded that the balance of three other warrants were valid, and affirmed the superior court's denial of Phillip's motion to suppress "the evidence seized in executing the warrants for Phillip's apartment, motorcycle, email, cell phone, person, and DNA." Id. at 14, 16.

On remand, the State moved the trial court for issuance of a subpoena duces tecum directed to AT&T for Phillip's CSLI records. Phillip II, 9 Wn. App. 2d at 472. Rather than offering a new affidavit in support of the subpoena, the State filed a memorandum that attached six previously filed affidavits including: (1) the December 8, 2010 certification for determination of probable cause that included

6

information from the tainted May 2010 CSLI records, (2) the affidavit for the May 22, 2010, search warrant for the CSLI records that the trial court held insufficient, (3) an unsworn June 22, 2010, affidavit for the warrant to search Phillip's apartment, vehicle, and person that included information from the tainted May 2010 CSLI records, (4) the affidavit for the November 5, 2010 warrant for Phillip's DNA, (5) the affidavit for the January 25, 2012 warrant for Phillip's cell phone that included information from the tainted May 2010 CSLI record, and (6) the affidavit for the March 22, 2012, renewed warrant for Phillip's CSLI records that included information from the tainted CSLI record and that this court held insufficient. Id. The superior court granted the subpoena for Phillip's cell phone records on July 24, 2017. Id. at 474.

This court granted discretionary review. Id. We held the subpoena failed as a matter of law under Carpenter, which held that an individual maintains an expectation of privacy in CSLI records, and the constitutionally appropriate way to obtain such records is through a warrant. See Phillip II, 9 Wn. App. 2d at 478-79 (citing Carpenter v. United States, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018)). In addition to holding the State used the wrong vehicle to obtain Phillip's cell phone records, we stated "the trial court's order also failed to include any particularized finding of what fact supported a conclusion that the State had met its probable cause burden for Phillip's cell phone records." Id. at 481. We reversed, vacated the subpoena, and remanded. Id.

On remand, on October 13, 2020, the superior court approved a new warrant for Phillip's cellular data. The 2020 warrant is supported by an affidavit of

7

probable cause that includes information known to law enforcement before May 27, 2010, and information contained in the three affidavits submitted in support of the warrants for Philip's apartment, vehicle, person, DNA, and phone device. The 2020 affidavit contained information learned from the warrants we approved in 2016, including the likelihood of Phillip's DNA being present at the crime scene.

The State indicated an intent for the 2020 affidavit to omit any reference to the contents of Phillip's cell phone records or information learned from them. It is not clear that the State succeeded in excising information learned from Phillip's cell phone records in one respect. The State's 2020 affidavit included the information that, on June 30, 2010, detectives spoke with Kathy Sanguino, identified as Phillip's mother. It relied on the detectives' interview with Sanguino for the fact that Phillip borrowed her vehicle on May 21, 2010, and returned it the next day. The 2020 affidavit does not describe how Sanguino became known to police. The record separately discloses that police learned from the illegally obtained records that Phillip made a phone call to a number on the night of the murder, which was later associated with Phillip's friend Mike Fowler. The record indicates that Fowler identified Phillip's mother to police. The State describes the record as "underdeveloped" on this point, and it is true the record does not indicate precisely that police learned of Fowler's number from Phillip's cell phone records—as opposed to his phone itself, whose search is not challenged. Nevertheless, the record before this court at this time suggests an inference that police learned Fowler's and Sanguino's identities from review of Phillip's cell phone records.

8

Phillip filed a CrR 3.6 motion to suppress the contents of his cell phone records, arguing the 2020 warrant is invalid on several grounds. The superior court ruled there was probable cause for the warrant to issue, and that the 2020 warrant was valid. It found there were no intentional or reckless omissions in the affidavit and that the warrant was proper under the independent source doctrine. Accordingly, the superior court denied Phillip's CrR 3.6 motion.

The parties stipulated and the superior court certified that its ruling involved a controlling question of law as to which there is a substantial ground for a difference of opinion, and that immediate review may materially advance the ultimate termination of litigation, under RAP 2.3(b)(4). This court granted discretionary review.

II

We first consider Phillip's argument that the 2020 warrant cannot be sustained under the independent source doctrine. We review the trial court's factual findings supporting the suppression decision for substantial evidence. State v. Hilton, 164 Wn. App. 81, 89, 261 P.3d 683 (2011). Unchallenged findings are accepted as true on appeal. Id. The trial court's conclusions of law drawn from those factual findings are reviewed de novo. Id.

Whether the facts in an affidavit support probable cause is a question of law this court reviews de novo. State v. Nusbaum, 126 Wn. App. 160, 166-67, 107 P.3d 768 (2005). "A search warrant should be issued only if the application shows probable cause that the defendant is involved in criminal activity and that evidence of the criminal activity will be found in the place to be searched." State v. Neth,

165 Wn.2d 177, 182, 196 P.3d 658 (2008). "It is only the probability of criminal activity, not a prima facie showing of it, that governs probable cause." State v. Maddox, 152 Wn.2d 499, 505, 98 P.3d 1199 (2004). "An affidavit in support of a search warrant must be based on more than mere suspicion or personal belief that evidence of a crime will be found on the premises searched," and should be evaluated in a commonsense manner. Neth, 165 Wn.2d at 182-83. "[G]eneralizations do not alone establish probable cause." State v. Thein, 138 Wn.2d 133, 148-49, 977 P.2d 582 (1999). However, "[p]robable cause exists if the affidavit in support of the warrant sets forth facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime can be found at the place to be searched." Id. at 140. And, "[t]he fact that there are some generalizations in the inferential chain does not defeat the reasonableness of the inference." State v. Denham, 197 Wn.2d 759, 768-69, 489 P.3d 1138 (2021).

The exclusionary rule provides for the suppression of evidence obtained from an unconstitutional search. State v. Mayfield, 192 Wn.2d 871, 874, 888, 434 P.3d 58 (2019). Under the independent source doctrine, evidence obtained through an unconstitutional search may nonetheless be admissible if it is "ultimately obtained . . . pursuant to a valid warrant or other lawful means independent of the unlawful action." State v. Gaines, 154 Wn.2d 711, 718, 116 P.3d 993 (2005). "To determine whether challenged evidence truly has an independent source, courts ask whether illegally obtained information affected (1) the magistrate's decision to issue the warrant or (2) the decision of the state agents

10

to seek the warrant." State v. Betancourth, 190 Wn.2d 357, 365, 413 P.3d 566 (2018).

A

The magistrate's decision authorizing the 2020 warrant was based on a combination of information authorities learned before they sought the 2010 warrant for Phillip's cell phone records and information they learned later, including from additional witness interviews and from the warrants we upheld in Phillip I. Although police knew more information than they relied on when they sought the 2010 warrant on May 27, 2010, after making that application Auburn police interviewed Phillip twice on May 28, 2010, and June 2, 2010, learning of the cut on his hand. They also interviewed Phillip's co-workers on June 9, 2010, learning of his potentially misleading statements about the cause of his hand injury and his regular use of zip ties like those found at the murder scene. In subsequent months they learned of Phillip's probable DNA match based on one of the warrants we upheld.

Phillip first argues any evidence discovered after the illegal search is tainted and should not be considered, including information gained pursuant to the three warrants this court found valid in Phillip I. We disagree. Phillip relies on State v. Miles, in which police obtained inculpatory bank records through an administrative subpoena, which was held to be a violation of article I, § 7, and later sought a warrant for the same information. 159 Wn. App. 282, 284, 244 P.3d 1030 (2011). In noting that there was "no dispute" that the first prong of the independent source doctrine was satisfied, the court observed that in seeking the warrant the

11

authorities relied "solely" on information that had been known before the invalidated administrative subpoena issued. Id. at 296. As the State points out, however, Miles did not hold that the independent source doctrine requires that the government must rely "solely" on information known before an illegal search. There is no dispute the State may rely on information it knew, but did not rely on, at the time it sought the original 2010 warrant for Phillip's cell phone records. But neither Miles nor other authority cited by Phillip holds that the State may not rely on information, if it is independent, learned after reviewing the illegally seized cell phone records.

Phillip next asks us to revisit the validity of the three warrants the court upheld in Phillip I. We decline to do so. The law of the case doctrine provides that an appellate court decision is binding in subsequent stages of the same litigation. State v. Schwab, 163 Wn.2d 664, 671-72, 185 P.3d 1151 (2008). Under RAP 2.5 (c)(2), the law of the case doctrine is discretionary:

> The appellate court may at the instance of a party review the propriety of an earlier decision of the appellate court in the same case and, where justice would best be served, decide the case on the basis of the appellate court's opinion of the law at the time of the later review.

"[T]he appellate court may reconsider a prior decision in the same case where that decision is 'clearly erroneous, . . . the erroneous decision would work a manifest injustice to one party,' and no corresponding injustice would result to the other party if the erroneous holding were set aside." Id. (alteration in original) (quoting Roberson v. Perez, 156 Wn.2d 33, 42, 123 P.2d 844 (2005)). Phillip does not

12

demonstrate any changes of law or circumstance have occurred since Phillip I that would cause a manifest injustice if we adhere to our 2016 decision.

Phillip asks the court to reassess the three warrants we upheld "based on the information that is now available." Phillip argues that trial testimony (which predated our 2016 opinion) "sheds further light on the facts such as the supposed cut on Mr. Phillip's hand or the nature of the zip ties." This testimony concerns only Phillip's dispute with Auburn police over the nature and significance of his injury and the alleged commonplace nature of the zip ties. This argument does not implicate the independence of the police learning about Phillip's hand injury and access to similar zip ties, which they learned before they received Phillip's cell phone records. Phillip further argues that Mayfield has been decided since Phillip I, in which the court concluded Washington's constitution did not permit recognizing an attenuation doctrine as broad as the federal courts have recognized. Mayfield, 192 Wn.2d at 874-75. Also new since Phillip I is Betancourth, in which the court held, in the particular circumstances of that case, authorities could rely on evidence originally seized pursuant to an invalid district court warrant by reseizing the evidence based on a new superior court warrant. 190 Wn.2d at 370. In Betancourth, the court was careful to observe that it was not endorsing and had not endorsed a "good faith or reasonableness" exception to the warrant requirement. Id. at 367. But neither Mayfield nor Betancourth narrowed the independent source doctrine in a manner calling for us to revisit our decision in Phillip I. We therefore apply the law of the case doctrine and decline to revisit

our decision upholding the warrants for Philip's apartment, vehicle, person, DNA, and phone device.

Phillip argues for the first time on appeal that the information stemming from the interview with Sanguino in the 2020 warrant is tainted derivative evidence. The record we have asserts that authorities learned of Sanguino's identity from Fowler, and it inferentially supports the conclusion that authorities learned of Fowler by discovering his phone number among Phillip's illegally seized cell phone records. We will assume without deciding that the authorities' knowledge of Sanguino and in turn their knowledge that Phillip borrowed her car was derivative of the suppressed cell phone records. We therefore excise the information relating to Sanguino and evaluate whether the balance of the 2020 affidavit supports probable cause to seize Phillip's cell phone records. See State v. Eserjose, 171 Wn.2d 907, 928, 259 P.3d 172 (2011) ("[E]vidence obtained pursuant to a warrant is admissible, even though the warrant recites information tainted by an unconstitutional search, provided the warrant contains enough untainted information to establish probable cause.") (citing Gaines, 154 Wn.2d at 719).

When Sanguino's statements are removed, the affidavit establishes (1) Frankel's assailant was not motivated by robbery, (2) Phillip had expressed love for Johnson, viewed Frankel with disdain, and saw him as a romantic obstacle, (3) Phillip was expressing these feelings around the time of the murder, (4) Johnson believed Phillip might have wanted to hurt Frankel, (5) zip ties found with Frankel's body were identical to those Phillip used at work, (6) Phillip lied about a laceration on his hand and tried to conceal it from detectives, (7) there was a "high degree of

14

probability" Phillip's DNA was present on a bloody towel found at the scene, (8) Phillip owned and used a cellular phone, (9) cellular phones track and record location data, and (10) when Phillip, who lived in Portland, was asked if he had traveled to Auburn, he asked for counsel. This information, taken together, establishes probable cause that Phillip was involved in Frankel's murder, and that evidence of his involvement was likely to be found in his cell phone records. We therefore conclude that the illegally seized cell phone records did not affect the magistrate's decision to authorize the 2020 warrant.

B

We next consider whether the illegally seized evidence affected the decision of the state agents to seek the warrant. In Phillip I, when applying the independent source doctrine to the three warrants ultimately found to be valid, we found Phillip was "a person of interest under active investigation" before June 20, 2010, when police received the cell phone records from Phillip's wireless provider. No. 72120-8-I, slip op. at 16. We stated, "based on the information gathered in their investigation prior to June 20, the police had probable cause to believe Phillip was involved in the crime and would have sought additional warrants even without knowledge of cell phone records." Id. While this is not the law of the case, as the 2020 warrant was not before this court at that time, the fact that independent motivation to investigate Phillip was found to exist before June 20, 2010 is both true and persuasive.

15

Phillip argues the request for the 2020 warrant is "intertwined with the original illegality and does not rest on genuinely independent investigation." Phillip contrasts Miles, in which it was undisputed "the State did not rely on any evidence obtained from the administrative subpoena previously issued by the Securities Division in obtaining the search warrant." 159 Wn. App. at 289. Miles rejected a standard a lower court had apparently applied for evaluating the motivation prong of the independent source doctrine in which the lower court analyzed whether "the State would have come upon the evidence other than from referral by the Securities Division after its flawed investigation." Id. at 289-90. The court described the motivation prong as requiring a factual determination of "whether the State's decision to seek the warrant was prompted by the illegal search or *whether the State would have sought a warrant if the Securities Division was not authorized to do so.*" Id. at 297 (emphasis added). Similarly, here, the question is not whether the State was motivated to seek the 2020 warrant because the earlier warrants were invalidated, but whether the State would have sought a warrant for Phillip's cell phone records if it had not seen the tainted evidence. Similarly, Betancourth makes the inquiry depend on whether the officers' motivation to seek the subsequent warrant is tainted by what they gleaned from the initial illegal search. 190 Wn.2d at 365.

Phillip became a person of interest early in the investigation based on Johnson's disclosures that she and Phillip had been romantically involved, Phillip had been disparaging of Frankel, Phillip had been "extremely upset" that Johnson chose Frankel over him, and Phillip was the only person Johnson could think of

who might want to harm Frankel. While Phillip correctly asserts that courts cannot automatically give dispositive effect to law enforcement's assertion of their own preexisting motivation, the State points out it does not follow that police have not demonstrated an independent motivation here. Police can point to an "historically verifiable fact demonstrating that the subsequent search pursuant to a warrant was wholly unaffected by the prior illegal search—e.g., that they had already sought the warrant" before obtaining the records. United States v. Murray, 487 U.S. 533, 540 n.2, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988). Police were motivated to establish the location of Phillip's phone before they saw the contents of his cell phone data. Their motivation has not changed since before they sought the initial warrant. Case law cited by Phillip does not foreclose the possibility that compelling independent developments coming after an illegal search can provide a motivation independent of that supporting an earlier effort. Phillip cites, for instance, State v. Holland, 176 N.J. 344, 363, 823 A.2d 38 (2003), which held that "when the same officer participates in an improper search and in an arguably lawful one occurring only a short time later," establishing an independent motivation for the second search "will be most difficult." The facts of Holland do not fully accord with the facts in this case, but the probable DNA match resulting from a later, valid warrant provides additional support, independent of the cell phone records, for the police's preexisting motivation to discover Phillip's whereabouts during the night of the murder. We affirm the trial court's conclusion that the illegal seizure did not affect the authorities' decision to seek the 2020 warrant.

17

III

Phillip argues the 2020 warrant lacks a nexus to the crime and is overbroad. A warrant is overbroad if it "describes, particularly or otherwise, items for which probable cause does not exist." State v. Maddox, 116 Wn. App. 796, 805, 67 P.3d 1135 (2003), aff'd, 152 Wn.2d 499, 98 P.3d 1199 (2004).

Phillip argues the warrant for his cell phone records lacked a nexus to the crime and "rested on generalities about phone usage," in part because "the police had no reason to believe he used the phone to commit the murder." The probable cause standard requires only that evidence relating to the murder is likely to be found in the cell phone records. Because Phillip was texting Johnson around the time of the murder and had used his phone to discuss the victim, it was reasonable to infer that he had the phone on his person at that time and that cell phone records including CSLI would show if his phone, and by inference Phillip, was near the scene of the crime at the time of the murder. This is a reasonable, "commonsense"-informed inference, not a broad generalization. Thein, 138 Wn.2d at 148-49.

Phillip argues the warrant was overbroad because there was not probable cause to seize the span of records from April 1, 2010 to May 26, 2010. The trial court concluded, "In the context of a homicide investigation, it is reasonable for investigating officers to request records such as these over a span of time in order to prove the identity of the person using the phone, to establish patterns of usage, and to give context to usage. The span of the records obtained covered less than 8 weeks [and] was not overbroad."

18

In Denham, where the underlying crimes were second degree burglary and first degree trafficking in stolen property, a warrant authorized seizure of five months of phone records. 197 Wn.2d at 764-65. Although the breadth of the warrant was not challenged on appeal, the State acknowledged "correctly, that this was overbroad both in time and scope." Id. Denham does not imply that the eight weeks span of time authorized here was overly invasive. And if anything, the State heeded Denham in seeking only the time frame leading up to the date of the murder and immediately after. We do not find a basis to disturb the time frame covered by the warrant.

IV

Phillip argues the 2020 warrant is invalid because the affidavit contains material misrepresentations and omissions. Misstatements or omissions in affidavits for search warrants affect the warrant's validity if they are (1) material, and (2) made knowingly or intentionally or with reckless disregard for the truth. Franks v. Delaware, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). An allegation of mere negligence or innocent mistake is insufficient to impugn the warrant. State v. Garrison, 118 Wn.2d 870, 872 827 P.2d 1388 (1992). If material omissions or misstatements are shown, the court deletes or inserts evidence as appropriate and then re-evaluates the affidavit. Id. at 873. Only if probable cause becomes deficient is the defendant entitled to an evidentiary hearing. Id.

Phillip argues the warrant omitted information from the Portland detective who first interviewed Phillip on May 25, 2010. Phillip refers to the detective's trial testimony that Phillip "had no apparent injuries, scratches, or bleeding on May 25[,

2010]." Throughout his testimony, the detective never stated that Phillip did not have an injury to his right hand. The detective stated only that he did not notice one. The detective was not asked to look for wounds or injuries. In contrast, Auburn officers who interviewed Phillip on May 28, 2010 and on June 2, 2010 stated they noticed an injury. Phillip does not show an omission of fact that was made deliberately or with reckless disregard in the warrant application's omitting the Portland detective's equivocal testimony about not noticing an injury.

Phillip argues the warrant materially misrepresents Phillip's description of his contact with Johnson. The affidavit states that during the May 25 interaction with the Portland detective, Phillip claimed Johnson "was 'just a friend.' He told [the Detective] that he had not seen Johnson in weeks" but, the affidavit continues, this was misleading because "Phillip failed to mention that he had been in very recent contact with Johnson via text messaging." This appears in the trial court's order. Meanwhile, the Portland detective testified at trial that Phillip volunteered that he had recently communicated with Johnson via text message. The State concedes this is a mistake. However, even if this finding is removed from the trial court's order, it would not eliminate probable cause, and is therefore not material. Phillip also does not show that this error was made deliberately or with reckless disregard for the truth. Accordingly, the 2020 warrant is not invalid because of a misrepresentation in the supporting affidavit.

V

Phillip argues the cell phone records should be suppressed because the State would not have access to them but for the initial unlawful search. This

20

argument is without merit. There is no requirement that police reseize the cell phone records from Phillip's wireless carrier. In Miles, this court stated, " '[R]eseizure of tangible evidence already seized is no more impossible than rediscovery of intangible evidence already discovered. The independent source doctrine does not rest upon such metaphysical analysis, but upon the policy that, while the government should not profit from its illegal activity, neither should it be placed in a worse position than it would have otherwise occupied.' " 159 Wn. App. at 294-95 (quoting Murray, 486 U.S. at 541-42). While Phillip argues that his carrier would not normally have kept this information for 10 years, the State persuasively rebuts Phillip's argument. A records custodian for the carrier testified at trial that once police request records, the carrier takes steps to retain those records outside the normal retention policy. In addition, the flawed 2010 and 2012 warrants did not direct the carrier to preserve Phillip's records. The carrier chose to retain the data on its own.

VI

In a statement of additional grounds, Phillip argues his attorney-client privilege was violated when, during a valid search of his cell phone's contents, police discovered messages Phillip exchanged with a law firm inquiring about representation and delivered them to the prosecutor's office. We addressed this issue in Phillip I. At a hearing on Phillip's motion to dismiss before his first trial, the trial court ruled the State had rebutted the presumption of prejudice and the court could not find any injury to Phillip's rights to due process, counsel, and a fair trial. Phillip I, No 72120-8-I, slip op. at 6. We held, "The trial court's decision is based

21

on the correct legal standard and is not manifestly unreasonable.  There was no abuse of discretion."  Id. at 8.  Phillip fails to justify our revisiting this issue.

We affirm and remand for proceedings not inconsistent with this opinion.

_Birk, J._

WE CONCUR:

_Bowman, J_      _Hazelrigg, A.C.J_